882 F.2d 949
 132 L.R.R.M. (BNA) 2357, 113 Lab.Cas. P 11,533
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, AFL-CIO;
and Pipeline Workers Local Union No. 38,
affiliated with Laborers' International
Union of North America,
AFL-CIO, Respondents,
and
Pipeline Workers Local Union No. 350, affiliated with
Laborers International Union of North America,
AFL-CIO; and Rollin P. Vinall,
Additional Respondents in Contempt.
 No. 84-4035.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 8, 1989.
 
 Joseph A. Oertel, Arleen Armstrong, William Wachter, Deputy Assoc. Gen. Counsel, N.L.R.B., Sue Dishuck Gunter, Asst. Gen. Counsel, Stanley R. Zirkin, Deputy Asst. Gen. Counsel, Contempt Litigation Branch, N.L.R.B., Karen Cordry and Paul D. Boynton, Attys., Washington, D.C., for petitioner.
 Marvin Menaker, Dallas, Tex., Orren Baird, Connerton, Ray & Simon, Washington, D.C., for respondents.
 Michael Dunn, Director, Reg. 16, N.L.R.B., Fort Worth, Tex., for other interested parties.
 Petition for Adjudication in Civil Contempt and for other Civil Relief.
 Before GARZA, REAVLEY, and POLITZ, Circuit Judges.
 GARZA, Circuit Judge:
 
 Background
 
 1
 Pipeline Workers Local Union 38 ("Local 38"), until its bankruptcy on June 3, 1985, operated a nonexclusive referral system under successive collective bargaining agreements between the Laborer's International Union of North America and the Pipeline Contractors Association. On February 21, 1980, the National Labor Relations Board ("Board") issued a decision and order finding that Local 38 had unlawfully refused to refer certain employees because of their political opposition to the Local 38 business manager. The Board ultimately found Local 38 liable for about $248,000, and the International liable for about $5,600, in backpay and welfare and pension benefits. On December 17, 1984, the Fifth Circuit issued a decision enforcing the Board's order. See NLRB v. Laborers' International, 748 F.2d 1001 (5th Cir.1984). The International paid its share of the judgment, but Local 38 did not, and instead filed a writ of certiorari to appeal the Fifth Circuit decision.
 
 
 2
 The Supreme Court denied certiorari, at which point the Board demanded payment from Local 38 of backpay plus the interest due, which totalled about $408,000. Local 38 filed for bankruptcy on July 3, 1985; at that point, the backpay and interest award comprised more than 96% of Local 38's liabilities.
 
 
 3
 Prior to Local 38's filing for bankruptcy, the Vice-President of the Laborers' International Union of North America ("International") requested that a new local be chartered with the same jurisdiction (Texas, Oklahoma, Southern New Mexico) as Local 38. The International approved this request, and on June 26, 1985 it directed that the entire membership of Local 38 (about 365 persons) be involuntarily transferred into the yet to be chartered Pipeline Workers Local Union No. 350 ("Local 350"). The provisional charter was finally issued on August 5, 1985, retroactive to June 26, 1985.
 
 
 4
 In bankruptcy court, the Board filed a proof of claim on August 2, 1985, and attended a creditors meeting a few weeks later. The discriminatees for whom the Board was fighting ended up, in the trustee's Report of Proposed Final Distributions filed December 24, 1986, getting about 14% of what they were entitled. Local 38 did not receive a discharge from its debts, since only individuals, not entities, are entitled to such discharges under 11 U.S.C. Sec. 727(a)(1). However, since Local 38's entire membership had been transferred to Local 350, it had no source of income (dues) and, therefore, there was no practical hope of collecting from it in the future.
 
 
 5
 Realizing it wasn't going to get much, the Board began to depose officers of Local 38, Local 350, and the International in order to investigate the possibility of holding them liable for the judgment. On June 8, 1987, the NLRB Contempt Branch notified counsel for Local 350 and the International that, as a result of its investigation, it had concluded that Local 350 was liable for the unsatisfied portion of Local 38's backpay liability. It also charged that the actions of the International and Locals were designed to frustrate attempts of the judgment issued by the Court of Appeals.
 
 
 6
 On November 17, 1987, the Board filed a petition to adjudicate the International and Local 350 in civil contempt for refusing to comply with the backpay judgment entered by the Court of Appeals. The Board alleged that the Respondents had acted in concert to render Local 38 judgment-proof by creating an alter ego and disguised continuance, namely Local 350. The Respondents denied that they had sought to evade or frustrate the judgment, and the case went to an evidentiary hearing before a Special Master on October 6 & 7, 1988. The Special Master's report was issued on January 19, 1989, recommending that the Board's allegations be dismissed in their entirety.
 
 Liability of Local 350
 
 7
 The Board first argues that the master's report should have found Local 350 liable for the judgment against Local 38 under a theory of alter ego or disguised continuance. The master held, in part, that Local 350 was not an alter ego of Local 38 because the assets, books, and records of the two entities were maintained separately. Moreover, the master reasoned that since Local 350 did not have a viable existence until after Local 38 filed its petition in bankruptcy, it could not be an alter ego. The master specifically declined to rule on the question of whether Local 350 was a successor union because the Board did not raise this theory in the contempt proceedings and because this issue should be decided in the first instance by the Board. Because we conclude that Local 350 was the successor of Local 38, we do not reach the alter ego issue.
 
 
 8
 The successor liability doctrine was first applied to labor unions, as opposed to employers, in Local Union No. 46, Metallic Lathers (Cement League), 259 NLRB 70 (1981), enforcement denied in pertinent part, 727 F.2d 234, 237-38 (2d Cir.1984), in which the Board noted that victims of unfair labor practices by unions need a meaningful remedy just as much as victims of unfair labor practices by employers. The Second Circuit in Cement League refused to enforce the imposition of liability on the Carpenter's Union, the alleged successor, not because it considered the successor doctrine inapplicable to unions, but because it found that the Carpenters had no knowledge of the unfair labor practices at the time of the succession. 727 F.2d at 237-38.
 
 
 9
 In Local Union No. 5741, United Mine Workers v. NLRB, 865 F.2d 733 (6th Cir.1989), the Sixth Circuit considered a case that is remarkably similar to the case at bar. That case involved Local Union 9639, which owed a worker a $12,000 judgment as the result of an unfair labor practice. Two weeks after enforcement was granted by the Sixth Circuit, Local 9639 filed a petition under Chapter 7 of the Bankruptcy Code. Local 9639 was not granted a discharge by the bankruptcy court, and as a result the local simply ceased to function, and ultimately surrendered its charter to the UMW. The ex-members of Local 9639 transferred their memberships to another nearby local, Local 5741. Local 5741 had been in existence long prior to the incidents leading to Local 9639's bankruptcy, instead of being specially chartered to receive the ex-members of Local 9639. In addition, the court did not find that Local 5741 solicited the ex-members of Local 9639 to transfer their memberships; rather, the transfers were prompted by informal word of mouth between local miners, who discussed the proximity of Local 5741.
 
 
 10
 The Sixth Circuit held that Local 5741 was the successor of Local 9639, and therefore responsible for the unfair labor practice judgment against Local 9639. In reaching that holding, the court considered a "laundry list" of factors which are relevant to a finding of successorship.[1]
 
 
 11
 Although the special master did not specifically address the liability of Local 350 on a successorship theory, when one compares his factual findings with the facts of Local Union No. 5741, one cannot avoid the conclusion that Local 350 was a successor of Local 38. The territorial jurisdiction assigned to Local 350 by the International was exactly the same territory that Local 38 had exercised jurisdiction over prior to its bankruptcy. Local 350 members performed the same type of work and policed the same pipeline agreement that Local 38 had previously performed. After Local 350 received its charter, it functioned under the same Uniform Local Constitution under which Local 38 had previously operated. When the membership of Local 38 was administratively transferred to Local 350, the members did not have to pay new initiation fees when they joined Local 350. Moreover, the dues structure for Local 350 was the same as in Local 38, and former members of Local 38 were given credit for any excess. Some, but not all, of the members of the Executive Board and some of the employees of Local 350 had previously served in the same capacities in Local 38.
 
 
 12
 In light of the above facts, we are convinced that a clear case of successorship is presented. In fact, the case for holding that Local 350 is a successor to Local 38 is even stronger than the case before the Sixth Circuit in Local Union No. 5741. Not only did Local 350 know about the judgment against Local 38, it was created for the express purpose of accepting Local 38's membership after it filed for bankruptcy. Moreover, the transfer of members was administrative, and the ex-members of Local 38 did not have to pay initiation fees at Local 350.
 
 
 13
 Once the Board has made a prima facie case of noncompliance with the order, the burden is on the respondent to show, plainly and unmistakably, that it is unable to comply. Donovan v. Sovereign Security, Ltd., 726 F.2d 55, 59 (2d Cir.1984); NLRB v. Trans Ocean Export Packing, Inc., 473 F.2d 612, 616 (9th Cir.1973). The master has not made any findings regarding Local 38's ability to pay or whether, had Local 38 tried to raise the money to pay the judgment, the attempt would have been futile. This, however, does not preclude our finding that Local 350 is liable as a contemnor, since it did not meet its burden of proving that Local 38 would have been unable to meet the judgment had its membership not been transferred to Local 350.
 
 
 14
 It was not necessary for the master to decline consideration of the successorship issue. In general, the Board is the appropriate forum to make the initial successorship determination. However, Circuit Courts also have jurisdiction to consider the successorship issue in contempt proceedings. The Supreme Court made note of this fact in Southport Petroleum Co. v. NLRB, 315 U.S. 100, 106, 62 S.Ct. 452, 455, 86 L.Ed. 718 (1942): "Whether there was a bona fide discontinuance and a true change of ownership ... or merely a disguised continuance of the old employer, does not clearly appear, and accordingly is a question of fact to be resolved by the Board on direct resort to it, or by the court if contempt proceedings are instituted."
 
 
 15
 Local 350 relies on NLRB v. FMG Industries, 820 F.2d 289 (9th Cir.1987) for the proposition that the Board must make a successorship determination in the first instance before contempt proceedings are initiated. This reliance is misplaced. The court in FMG Industries held that "the Board should make the initial successorship determination unless an unusually clear case is involved. Only then do contempt proceedings before [a Circuit Court] provide the proper forum." Id. at 293. See also Aquabrom, Div. of Great Lakes v. NLRB, 746 F.2d 334, n. 2 (6th Cir.1984).
 
 
 16
 Other Fifth Circuit panels have determined the successorship issue for the first time in a contempt proceeding. In NLRB v. Tempest Shirt Manufacturing Co., 285 F.2d 1 (5th Cir.1960), we held, in a proceeding on petition of the Board for adjudication in civil contempt, that a successor corporation was bound by an order in a previous case against the prior corporation. It is inherent in the nature of that proceeding that the court considered that it had jurisdiction over the successorship issue and that it was proper to decide that issue within the context of a proceeding in civil contempt. Moreover, it should be noted that the Tempest court found that the facts before it presented a clear case of successorship under the test it applied. Id. at 4.
 
 
 17
 The master could have, and should have, properly considered the successorship issue. Instead, the master noted that the Board had not specifically pleaded the successorship issue, but had rather proceeded only on a case of alter ego. Master's Report at n. 2. This is not entirely accurate; the Board's petition in contempt alleges throughout that Local 350 is the alter ego and disguised continuance of Local 38. In light of the doctrinal vagaries in this area of labor law, we decline to take such a strict and wooden approach to the petition. While we are certainly aware of the distinction between alter ego and successorship doctrines, the Board's inclusion of the phrase "disguised continuance," which can be considered roughly synonymous with an allegation of successorship, as well as the facts alleged and the nature of the Board's petition, was sufficient to provide notice to the Union of the nature of the dispute, the relevant theories of liability, and the type of relief sought.
 
 
 18
 The master also refused to consider the successorship issue on the basis that the determination should have been raised in the first instance in front of the Board. However, as we have already concluded, this case falls within the "clear case" exception recognized in FMG Industries and prior cases. Moreover, since the master's extensive factual findings were sufficient to allow us to consider the successorship issue, we have decided that issue ourselves rather than send it back to the master for further proceedings. The master also found it problematic that our original order in this case was silent on the liability of successors. This omission does not allow Local 350 to escape liability, since it could reasonably be implied from our prior order that Local 38's successors would also be liable. Our prior silence should not be construed as a limitation on our order, since we did not anticipate the steps the Union and the International would take to frustrate our judgment.
 
 
 19
 In light of the above analysis, we conclude that Local 350 is properly considered the successor to Local 38, and as such is jointly and severally liable for the amount of the backpay judgment. In making this determination, we accept the relevant factual findings made by the master, but reject the legal conclusions leading to his failure to address the successorship issue. We therefore grant the Board's petition in civil contempt against Local Union 350.
 
 Liability of the International and Vinall
 
 20
 The master's report also declined to hold the International and Rollin Vinall, a Vice-President and regional manager of the International, liable as aiders and abettors of Local 350 in evading our judgment. This presents a somewhat closer case than the one for successorship, but we nonetheless hold that the International and Vinall are also in contempt of our prior order as a result of their indispensable role in aiding Local 38 to evade our backpay order.
 
 
 21
 The master found, as a factual matter, that the International, through Vinall, was aware of Local 38's intention to seek bankruptcy relief. Although the ultimate decision to file for bankruptcy was made by Local 38's board, the International could have overruled this decision under its powers in Article II, Sec. 2(b) or by appointing a trustee pursuant to Article IX, Sec. 7 of the International's Constitution.[2] In fact, the master found that an assistant to Vinall told the discriminatees that Local 38 would file in bankruptcy before it paid any prospective judgment which might be entered. The master further found that Vinall advised Local 38 that the International would be able to charter a new local to represent the members who had formerly belonged to Local 38. Vinall then submitted the charter application to the International for Local 350.
 
 
 22
 In light of these facts, which we accept, the master reached the legal conclusion that the International and Vinall did not conspire with Local 38 to evade this court's order because the filing of a petition in bankruptcy is not an unlawful act. This conclusion is in error. One need not commit an unlawful act in order to be liable for conspiring to evade a judgment of a court: it is contempt to act solely for the purpose of evading a judgment. NLRB v. Deena Artware, 361 U.S. 398, 414, 80 S.Ct. 441, 449, 4 L.Ed.2d 400 (1960) (Frankfurter, J., concurring); see also Parker v. United States, 126 F.2d 370 (1st Cir.1942). Moreover, any party who knowingly aids, abets, or conspires with another to evade an injunction or order of a court is also in contempt of that court. Regal Knitwear v. NLRB, 324 U.S. 9, 14, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945); Waffenschmidt v. MacKay, 763 F.2d 711 (5th Cir.1985).
 
 
 23
 The facts found by the master support our conclusion that the International and Vinall knowingly aided and abetted Local 38 in avoiding the order of this court. In addition to the facts noted above, the master also found that Local 38 made no effort to raise the money to pay this court's judgment while its petition for certiorari was pending in the Supreme Court, in the event that petition was denied. It did not assess additional monies from its members, undertake negotiations with financial institutions to ascertain if a loan could be obtained, or talk to the International or other local unions to determine if loans were available from such sources. Based on the above analysis, we find that the International and Vinall are in contempt of our prior order as a result of their actions in aiding and abetting Local 38's bankruptcy and the formation of Local 350, with full knowledge that these actions would defeat the judgment of this court against Local 38. In making our holding, we again accept the relevant factual findings of the master, but we differ with the legal conclusion to be drawn from those facts.
 
 
 24
 It does not matter that the Board did not argue before the bankruptcy court that Local 38's petition in bankruptcy was fraudulent. The Board was under no legal obligation to seek to overturn the bankruptcy filing. Since Local 38 did not, and could not, receive a discharge in bankruptcy, the determination of whether Local 350 was also liable for the backpay judgment as a successor or disguised continuance would have no real effect on the bankrupt estate. The question of whether a new entity, be it an employer or labor organization, is a successor, disguised continuance, or alter ego of another entity is a question of substantive labor law which could not have been decided, in this case, by the bankruptcy court. In re Goodman, 873 F.2d 598 (2d Cir.1989).
 
 
 25
 Where, as here, parties join together to evade a judgment, they become jointly and severally liable for the amount of damages resulting from the contumacious conduct. Vuitton v. Carousel Handbags, 592 F.2d 126 (2d Cir.1979). However, a civil contempt fine may not exceed the actual loss to the complainant caused by the actions of respondent, lest the contempt fine become punitive in nature, which is not appropriate in a civil contempt proceeding. Northside Realty Associates, Inc. v. United States, 605 F.2d 1348 (5th Cir.1979).
 
 
 26
 We therefore assess damages against the International and Vinall, jointly and severally, in the amount that the Board would have otherwise recovered had the International and Vinall not aided Local 38 to evade the prior order. Unfortunately, we do not have sufficient factual findings to allow us to calculate that amount. It is clear from the record before us that, in 1985-87, Local 38 and then Local 350 received from $100,000 to $300,000 per year. However, we cannot assume that Local 38, had it not transferred its membership and filed for bankruptcy, would have paid over its entire dues stream to satisfy the judgment. The Local had to pay its reasonable expenses and provide services for its members, otherwise the members would have resigned their memberships and terminated the local's dues stream. On the other hand, it is also clear from the record that Local 38 had a certain amount of "discretionary income" that it chose to spend rather than to apply towards the judgment.[3] The amount of damages assessable against the International is the amount that Local 38 would have been able to pay the Board had it avoided all but the most necessary expenses. Unfortunately, the record is not sufficiently developed to allow us to calculate that amount with reasonable certainty.
 
 
 27
 It is therefore ordered that all parties to this case meet and bargain in good faith to settle on a schedule for payment of the judgment. If the parties are unable to reach agreement after 60 days from the date of this judgment, the case will be referred to a master on an expedited basis solely for a factual determination of the amount that the Board would have been able to collect had the International and Vinall not engaged in contumacious conduct. This amount will be calculated by establishing, from the date of our prior order enforcing the Board's backpay award to the date of this order, the income of Local 38 and Local 350 (which stepped into the shoes of Local 38), and subtracting only the most necessary expenses, leaving the International and Vinall jointly and severally liable for whatever is left over; this will represent the amount that Local 38 would have been able to devote to satisfying the judgment had it not filed for bankruptcy and had it sought to do pay the judgment with reasonable diligence. The master's determination, if necessary, will not affect the liability of Local 350, since it remains jointly and severally liable for the full amount of the judgment as a successor or disguised continuance; a master's factual determination would only determine the amount of liability of the International and Vinall. Local 38, Local 350, the International, and Vinall are hereby ordered not to take any further action which would frustrate the collection of this judgment until it is satisfied, including transferring the membership of Local 350 or engaging in a business combination, and also including further petitions in bankruptcy, without this court's explicit approval. All orders in this case are binding on all successors, disguised continuances, and alter egos of any of the parties. Lastly, we award attorneys' fees and costs to the Board in the amount required to bring this civil contempt proceeding; the Board is ordered to submit affidavits regarding hours spent to this court for the fee determination.
 
 
 28
 The Board's petition in civil contempt is GRANTED to the extent noted above.
 
 
 
 [1]
 The factors considered by the Sixth Circuit were as follows:
 1) whether the successor union had notice of the liability;
 2) the ability of the predecessor union to provide relief;
 3) whether there has been a substantial continuity of the union's operations;
 4) whether the successor union uses the same offices or encompasses the same jurisdiction;
 5) whether the successor union has absorbed the predecessor's membership;
 6) whether the officers of the predecessor union continued in some official capacity in the successor union;
 7) whether the wages, terms, and conditions of employment administered by the predecessor, as set forth in the collective bargaining agreement, are the same or substantially equivalent to those administered by the successor;
 8) whether the members continue to pay dues and enjoy the same membership rights;
 9) whether the members continue to work at the same trade for the same or similar employers.
 Local Union 5741 v. NLRB, 865 F.2d 733, 737 (6th Cir.1989).
 
 
 [2]
 Article II, Sec. 2(b) of the Constitution of the Laborers' International Union of North America reads:
 As the sovereign authority, [the International] has the power to issue Charters to Local Unions, District Councils and other subordinate bodies; and to define their powers and craft or territorial jurisdiction; to revise, amalgamate, or revoke existing charters; and to govern, discipline, regulate or supervise these subordinate bodies as hereinafter provided.
 Article IX, Sec. 7 reads in pertinent part:
 When the General President finds, in his opinion, that action by him is necessary for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures or otherwise carrying out the legitimate objects of such subordinate body or the International Union, or to protect the organization as an institution, he may ... appoint a temporary trustee or supervisor to take charge and control of the affairs of such subordinate body.... The trustee or supervisor shall be authorized to take full charge of the affairs of the subordinate body.... (emphasis supplied)
 
 
 [3]
 The evidence before the master shows that Local 38, after this court ordered enforcement of the backpay order of the Board but before certiorari was denied, proceeded to loan a total of $20,000 (one loan interest free) to two other locals, prepaid its rent for the next three years, and purchased three new cars for its business agents at a cost of $50,000