**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| INSTITUTE OF CETACEAN RESEARCH, a Japanese research foundation; KYODO SENPAKU KAISHA, LTD., a Japanese corporation; TOMOYUKI OGAWA, an individual; TOSHIYUKI MIURA, an individual, *Plaintiffs-Appellants*, <br><br> v. <br><br> SEA SHEPHERD CONSERVATION SOCIETY, an Oregon nonprofit corporation; PAUL WATSON, an individual, *Defendants-Appellees*. | No. 12-35266 <br><br> D.C. No. 2:11-cv-02043-RAJ <br><br><br> OPINION |

On a Motion for Contempt

Argued and Submitted
October 27, 2014—Pasadena, California

Filed December 19, 2014

Before: Alex Kozinski, A. Wallace Tashima, and Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

**SUMMARY**[*]

**Contempt**

The panel held defendant Sea Shepherd Conservation Society, its founder Paul Watson, and Sea Shepherd's volunteer board members in contempt for violating the panel's injunction prohibiting Sea Shepherd, Watson, and "any party acting in concert with them" from physically attacking or coming within 500 yards of the whaling and fueling vessels of the Institute of Cetacean Research and other plaintiffs on the open sea.

Declining to adopt the report and recommendation of the Appellate Commissioner, issued following a contempt hearing, the panel held that the defendants violated the injunction when they adopted a "separation strategy" under which they ceded control of their "Operation Zero Tolerance" campaign, designed to thwart the plaintiffs' whaling activities in the Southern Ocean, to foreign Sea Shepherd entities.

The panel held Sea Shepherd US in contempt on the basis that its separation strategy aided and abetted Sea Shepherd Australia and other Sea Shepherd entities to perform acts that would have violated the injunction if done by parties bound by it. In addition, Sea Shepherd US continued to provide material support to the OZT campaign after the injunction issued, confident that the entities it assisted would likely violate the injunction.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held Sea Shepherd US's volunteer board members in contempt based on their ratification of the separation strategy, and their approval of transfers of ownership of valuable property, for no consideration, to Sea Shepherd entities participating in OZT.

The panel held Watson in contempt as the Executive Director of Sea Shepherd US, as well as for personally violating the injunction by coming within 500 yards of one of the plaintiffs' vessels.

The panel held that against Sea Shepherd US and Watson, the plaintiffs were entitled to recover attorney's fees and costs incurred in bringing and prosecuting the contempt proceedings and to compensation for any actual damages suffered. The panel re-referred the matter to the Appellate Commissioner to determine the appropriate amount of attorney's fees and costs, as well as compensatory damages to award, and to determine the liability of the volunteer directors. The panel stated that the plaintiffs' requests for coercive sanctions and an order to compel compliance should be directed to the district court.

---

**COUNSEL**

John F. Neupert (argued), M. Christie Helmer, Sharae M. Wheeler, Miller Nash LLP, Portland, Oregon; James L. Phillips, Miller Nash LLP, Seattle, Washington, for Plaintiffs-Appellants.

Daniel P. Harris, Charles P. Moure, Rebecca Millican, Harris & Moure, PLLC, Seattle, Washington, for Defendant-Appellee Sea Shepherd Conservation Society.

Timothy G. Leyh (argued), Michelle Buhler, Charles S. Jordan, Calfo Harrigan Leyh & Eakes, LLP, Seattle, Washington, for Defendant-Appellant Paul Watson.

David F. Taylor (argued), Kathleen M. O'Sullivan, Zachary P. Jones, Perkins Coie, Seattle, Washington, for non-party respondents Lani Blazier, Marnie Gaede, Bob Talbot, Robert Wintner, and Ben Zuckerman.

Clare Loebs Davis, Katie Smith Matison, Lane Powell PC, Seattle, Washington, for non-party respondent Susan Hartland.

Kristina S. Bennard, Julia D. Woog, Yarmuth Wilsdon PLLC, Seattle, Washington, for non-party respondent Peter Rieman.

---

## OPINION

M. SMITH, Circuit Judge:

Institute of Cetacean Research (Cetacean), Kyodo Senpaku Kaisha, Ltd., Tomoyuki Ogawa, and Toshiyuki Miura (collectively, Plaintiffs) filed this contempt proceeding against Sea Shepherd Conservation Society (Sea Shepherd US), its founder Paul Watson, its administrative director Susan Hartland, and six volunteer members of the Sea Shepherd US board (collectively, Defendants). The Plaintiffs allege that the Defendants violated our injunction prohibiting Sea Shepherd US, Watson, and "any party acting in concert with them" from physically attacking or coming within 500 yards of the Plaintiffs' whaling and fueling vessels on the open sea.

After we handed down our injunction, the Defendants adopted what they called the "separation strategy." Pursuant to the strategy, they ceded control of the Operation Zero Tolerance (OZT) campaign, designed to thwart the Plaintiffs' whaling activities in the Southern Ocean, to foreign Sea Shepherd entities. The Defendants knew those entities would use assets transferred to them by the Defendants in the OZT campaign, and that there was a "very high risk" the entities would violate our injunction. It is undisputed that these foreign entities repeatedly committed acts against the Plaintiffs' whaling ships during the OZT campaign that would have violated the injunction if performed by the Defendants.

In this opinion, we consider whether the Defendants violated our injunction when they implemented the "separation strategy." The Plaintiffs contend that the strategy was aimed at evading our injunction and ensuring that the OZT campaign proceeded unabated, despite the issuance of the injunction. In support of their contention, the Plaintiffs point to undisputed evidence that the Defendants provided substantial assistance to the OZT campaign after our injunction issued. The Defendants contend, on various grounds, that they should not be held liable for the acts of entities they did not control and whose violations they could not prevent.

Our thorough review of the record in this case, and the concessions of counsel at oral argument, compel us to hold Sea Shepherd US, Watson, and Sea Shepherd US's volunteer board members in contempt for violating our injunction.

**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff Cetacean is a Japanese research foundation that has for many years received permits from the Japanese government authorizing it to take whales for research purposes. The International Convention for the Regulation of Whaling, to which the United States, Japan, and 87 other nations are signatories, authorizes whale hunting when conducted in compliance with a research permit issued by a signatory. *See* Int'l Conv. for the Regulation of Whaling, art. VIII, § 1, Dec. 2, 1946, 62 Stat. 1716, 161 U.N.T.S. 74. Japan issued such a permit to Cetacean that authorized it to take whales in the Southern Ocean during the period December 20, 2012 to March 31, 2013.

For several years, Sea Shepherd US and its founder, Watson, have opposed Cetacean's whale hunting efforts in the Southern Ocean. Sea Shepherd US is organized as an Oregon nonprofit corporation with tax-exempt status under section 501(c)(3) of the Internal Revenue Code. It is governed by an unpaid board of volunteer directors. Several current and former directors of the organization are respondents in this contempt proceeding.

In addition to Sea Shepherd US, there exist a number of foreign Sea Shepherd entities, including those organized and governed under the laws of Australia, Belgium, France, Germany, the Netherlands, and the United Kingdom. We sometimes refer to Sea Shepherd US and the other Sea Shepherd entities collectively as "Sea Shepherd."

Since 2004, Sea Shepherd has mounted a yearly campaign to prevent Cetacean from killing whales in the Southern Ocean. Sea Shepherd's tactics have included throwing smoke

bombs and glass containers of acid at the Plaintiffs' vessels; dragging metal-reinforced ropes in the water to damage the vessels' propellers and rudders; throwing safety flares with metal hooks at nets hung from the Plaintiffs' vessels in the hope that they will set fire to the vessels; and shining high-powered lasers at the Plaintiffs' vessels to annoy the crew. *See Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 860 F. Supp. 2d 1216, 1223–24 (W.D. Wash. 2012), *rev'd*, 725 F.3d 940 (9th Cir. 2013). Sea Shepherd has piloted its vessels in ways that make collisions with the Plaintiffs' vessels highly likely; in fact, collisions have occurred on several occasions. *Id*. Hoping to prevent Sea Shepherd's dangerous interference with its whaling activities, the Plaintiffs brought an action for injunctive relief in the United States District Court for the Western District of Washington. After the district court denied their request for a preliminary injunction, 860 F. Supp. 2d 1216, *rev'd*, 725 F.3d 940, the Plaintiffs appealed. We reversed. *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940 (9th Cir. 2013).

We issued an injunction pending appeal against Sea Shepherd US and Watson on December 17, 2012. The injunction provided in relevant part:

> Defendants Sea Shepherd Conservation Society and Paul Watson, and any party acting in concert with them (collectively "defendants"), are enjoined from physically attacking any vessel engaged by Plaintiffs the Institute of Cetacean Research, Kyodo Senpaku Kaisha, Ltd., Tomoyuki Ogawa or Toshiyuki Miura in the Southern Ocean or any person on any such vessel (collectively

> "plaintiffs"), or from navigating in a manner
> that is likely to endanger the safe navigation
> of any such vessel.    In no event shall
> defendants approach plaintiffs any closer than
> 500 yards when defendants are navigating on
> the open sea.

This injunction remains in effect pending further order of court. *Inst. of Cetacean Research*, 725 F.3d at 947.

At the time our injunction was handed down, Sea Shepherd US was organizing and preparing in earnest for OZT, its ninth annual whale defense campaign against the Plaintiffs.    Prior to the issuance of our injunction, Sea Shepherd US, as in previous years, had taken the lead administrative role in preparing for the campaign. It recruited both volunteer and paid crew, and outfitted and fueled four vessels for the campaign: the *Bob Barker*, *Steve Irwin*, *Sam Simon*, and *Brigitte Bardot*.    Sea Shepherd US had already spent over 2 million dollars on the campaign when our injunction issued.

Watson received a copy of our injunction on December 18, 2012, the day after it issued.    At that time, Watson was in the Southern Ocean serving as campaign leader, just as he had in previous years.    Over the next several days, Watson and other members of Sea Shepherd devised a plan that would come to be known as the "separation strategy." Pursuant to the strategy, Sea Shepherd US would turn over control of OZT and transfer assets it owned to foreign Sea Shepherd entities, including Sea Shepherd Australia.    Sea Shepherd Australia is an Australian public company limited by guarantee and registered under the laws of Australia.    For each of the previous whale defense campaigns, Sea Shepherd

Australia has provided an operations base for the four vessels as well as logistical support.  Watson was a member of the boards of both Sea Shepherd US and Sea Shepherd Australia when the injunction issued.  As part of the separation strategy, Watson would step down from the boards of both entities, and a new OZT campaign leader would assume Watson's responsibilities.  Watson, however, would remain on board the *Steve Irwin* as an "observer" during the campaign.

The members of Sea Shepherd US's board learned of the injunction by email on December 18, 2012.  When the injunction was handed down, the board was composed of Watson, who was also the paid Executive Director of Sea Shepherd US, and volunteer members Lani Blazier, Marnie Gaede, Bob Talbot, Robert Wintner, Ben Zuckerman, and Peter Rieman, all of whom are respondents in this proceeding.

Gaede, the board's vice president, called a telephonic board meeting for December 20, 2012, during which Sea Shepherd US's attorneys discussed the significance of the injunction and advised the board members on how to respond. All of the board members were present, along with another respondent in this proceeding, Susan Hartland, Sea Shepherd US's Administrative Director.  The board discussed the separation strategy and agreed to implement it.  Shortly after the board meeting, members of Sea Shepherd US and Sea Shepherd Australia began working together to facilitate the transfer of operational control of OZT to Sea Shepherd Australia.  On December 22, 2012, Jeff Hansen, a board member of Sea Shepherd Australia, emailed Watson and Hartland regarding plans for Sea Shepherd Australia to "take

over," and for Bob Brown, a former Australian senator and decorated environmentalist, to lead the campaign.

Watson chaired a telephonic board meeting of Sea Shepherd Australia on December 27, 2012, in which the board unanimously resolved to assume responsibility for running OZT. Thereafter, Watson submitted his resignation from the Sea Shepherd Australia board and Brown became a member. On December 31, 2012, the Sea Shepherd Australia board resolved that Brown and Hansen would be the new leaders of OZT.

Despite its plan to separate from OZT, Sea Shepherd US's financial support for the campaign did not end immediately after the injunction was issued. Sea Shepherd US paid $163,405 in OZT-related expenses that were invoiced after the injunction was handed down. The majority of this money was spent to refuel the *Steve Irwin* and pay the credit card expenses of OZT ship captains.

On or about December 27, 2012, several of the Plaintiffs' whaling ships departed Japan for the Southern Ocean. Watson informed the Sea Shepherd US board of this development by email on December 27, 2012. Watson's email stated: "All four Sea Shepherd ships and their crew will be ready to greet the Japanese whalers when they arrive. They intend to kill whales and Sea Shepherd's objective is to see that not a single whale is slain. . . . It appears that the hunt is on and we intend to hunt whalers."

On December 28, 2012, Watson formally resigned from his various roles in Sea Shepherd US and as campaign leader for OZT, effective December 31, 2012. He surrendered command of the *Steve Irwin* to Siddharth Chakravarty, a

citizen of India, but remained on board the ship.  Other Sea Shepherd US employees participating in OZT also tendered their resignations to the board.  Although Sea Shepherd US stopped paying independent contractors serving as captains and crew members of OZT, Watson helped arrange for the crew to be paid by foreign Sea Shepherd entities.

There is evidence that Watson was not a mere passive participant in OZT after he resigned his leadership positions. During the OZT campaign, Watson appeared by phone on a radio show in March of 2013.  His answers to questions posed during the show indicate that he believed himself to be a participant in OZT, not just an observer.  He said, for instance, "*we're* chasing the Japanese factory ship *Nisshin Maru* and keeping it from killing whales."  When asked about the atmosphere aboard the ship, Watson said, "Oh, everybody's very upbeat on our ship because *we've* managed to make sure they don't kill many whales this year." (emphases added).

Watson was also consulted for guidance on how to proceed with certain aspects of the campaign.  For instance, on December 28, 2012, Chakravarty emailed a New Zealand customs official seeking permission to anchor the *Brigitte Bardot* off the New Zealand coast.  He learned that the ship would require a hull inspection.  Peter Hammarstedt, the captain of the *Bob Barker*, emailed Chakravarty that "[t]his will have to be Paul's decision.  Sid, please check with him and let us know ASAP."  After being asked by email for his "decision," Watson replied "[y]es proceed with this option." Watson was consulted for advice about logistical aspects of the campaign on several other occasions after the injunction was issued.

In a December 30, 2012 meeting, the Sea Shepherd US board accepted Watson's resignation and elected new board leadership consisting of Gaede as president, Wintner as vice president, Blazier as secretary, and Rieman as treasurer. The board formally voted to sever all financial and other forms of support to OZT in a series of emails exchanged between January 8 and 9, 2013. The board also voted to ratify a series of grants of property for no consideration to Sea Shepherd entities participating in OZT. Specifically, Sea Shepherd US granted ownership of the *Bob Barker* to Sea Shepherd Netherlands, and gave equipment to both Sea Shepherd Australia and Sea Shepherd Netherlands. The vessel and the equipment Sea Shepherd US granted had original purchase prices totaling over two million dollars.

On January 29, 2013, in violation of our injunction, the *Brigitte Bardot* approached within 20.25 yards of the *Yushin Maru 3*, one of the Plaintiffs' ships, while it was navigating on the open sea. Several additional violations of our injunction occurred on February 15, 17, 18, 19, 20, 24, 25, 27, and 28. Most violations involved incursions of the 500-yard safety perimeter established by the injunction, but collisions occurred on February 20 and 25 in the course of efforts by Sea Shepherd to prevent one of the Plaintiffs' ships from refueling. Watson was on board the *Steve Irwin* when these collisions occurred.

On February 11, 2013, the Plaintiffs filed a motion to find Sea Shepherd US in contempt and asked us to appoint a special master to conduct contempt proceedings. The basis of the motion was the January 29 incident in which the *Brigitte Bardot* approached within 500 yards of one of the Plaintiffs' vessels. On February 21, 2013, we referred the contempt motion to the Appellate Commissioner. The

Plaintiffs later amended their motion to allege additional acts of contempt, and to include Watson, the six volunteer directors, and Hartland as respondents to the contempt proceedings. The Appellate Commissioner held a contempt hearing in Seattle from October 28, 2013 to November 6, 2013. The parties stipulated that actions had occurred at sea that, if performed by enjoined parties, would violate our injunction, and testimony about those events was limited. The hearing focused on how Sea Shepherd US, Watson, the volunteer directors, and Hartland responded to our injunction, and their relationship to the persons and entities leading OZT after Sea Shepherd US's withdrawal from the campaign.

The Appellate Commissioner issued his Report and Recommendation on January 31, 2014. He recommended we find that none of the Defendants had committed an act of contempt, as he believed they had "adopted a 'separation' strategy and took reasonable steps to carry out that strategy in order to guarantee their own compliance with the injunction." The Commissioner determined that the Defendants had not directly violated the injunction and could not be held in contempt for the actions of the non-parties leading OZT.

The Plaintiffs and the Defendants each filed objections to the Commissioner's Report and Recommendation.

## JURISDICTION AND STANDARD OF REVIEW

In our February 25, 2013 order, we retained jurisdiction over "any further appeals or writs" in this case. *Inst. of Cetacean Research*, 725 F.3d at 948. We have "inherent power" to initiate contempt proceedings. *See Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 795 (1987) (citing *Michaelson v. United States ex rel. Chicago,*

*St. P., M., & O.R. Co.*, 266 U.S. 42, 45 (1924)).  We also have statutory authority to punish both civil and criminal contempt pursuant to 18 U.S.C. § 401.

The parties disagree regarding the standard of review applicable to the Appellate Commissioner's findings of fact in his Report and Recommendation.  The Defendants argue that the Commissioner acted as a special master, and thus that we should review his findings of fact for clear error.  The Plaintiffs, however, maintain that we should review the Commissioner's findings of fact de novo.

We need not resolve which standard of review applies to the Commissioner's findings of fact because our decision rests on grounds the Commissioner incorrectly rejected because of errors of law.  Specifically, the Commissioner wrongly concluded that the Defendants could not be held liable for aiding and abetting others to violate the injunction. The Commissioner also wrongly concluded that the volunteer directors' purported good faith reliance on advice of counsel was relevant to whether they violated the injunction.  Even if clear error review applied, it would still be appropriate to correct factual findings predicated on a misunderstanding of the governing rules of law.  *See Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 501 (1984) (citing *Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982); *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 n.15 (1982)).

## DISCUSSION

The Plaintiffs contend that the Defendants violated our injunction by aiding and abetting non-parties, including Sea Shepherd Australia, to commit acts prohibited by the

injunction.  The Plaintiffs argue that the purpose of the "separation strategy" was not to ensure compliance with our injunction, but to ensure that OZT proceeded unabated.  In addition, the Plaintiffs contend that Watson violated the injunction by personally coming within 500 yards of one of the Plaintiffs' ships.

The Defendants argue that they implemented the separation strategy in a good faith effort to comply with the injunction.  They further contend that they lacked control over the other Sea Shepherd entities and cannot be held accountable for the actions of these entities.

The volunteer board members point to their reliance on the advice of counsel as proof of their good faith in responding to the injunction, and argue that even if they would otherwise be liable for contempt, they are protected from liability by the Volunteer Protection Act, 42 U.S.C. § 14503.  Rieman argues that he should not be held in contempt because he resigned from the Sea Shepherd US board shortly after learning that a Sea Shepherd vessel had come within 500 yards of one of the Plaintiffs' ships.  Hartland, Sea Shepherd US's Administrative Director, argues that she should not be held in contempt because she was not a member of the board and did not vote to ratify the separation strategy.

We address these arguments in turn.

## I.  Sea Shepherd US's Contempt Liability

"Civil contempt . . . consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply."  *In re*

*Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). A party may also be held liable for knowingly aiding and abetting another to violate a court order. *See Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945) ("defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding"). "The party alleging civil contempt must demonstrate that the alleged contemnor violated the court's order by 'clear and convincing evidence,' not merely a preponderance of the evidence." *Dual-Deck*, 10 F.3d at 695 (citing *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982)).

The Plaintiffs argue that Sea Shepherd US's separation strategy aided and abetted Sea Shepherd Australia and other Sea Shepherd entities to perform acts that would have violated the injunction if done by parties bound by it. We agree, and hold Sea Shepherd US in contempt on this basis.

Sea Shepherd US's separation strategy effectively nullified our injunction by ensuring that OZT proceeded unimpeded, in part by using former Sea Shepherd US assets. Sea Shepherd US ceded control over OZT to Sea Shepherd Australia and other Sea Shepherd entities it believed to be beyond the injunction's reach, knowing these entities were virtually certain to violate the injunction. At the same time, Sea Shepherd US continued to provide financial and other support for OZT after the injunction by, among other things, transferring for no consideration a vessel and equipment worth millions of dollars to Sea Shepherd Australia and other entities.

## A.  Sea Shepherd US's Withdrawal from OZT

Sea Shepherd US chose to implement the separation strategy because it believed that doing so would allow OZT to proceed.  There was clear and convincing evidence that Sea Shepherd US was highly motivated to see the OZT campaign completed.  Shortly after the injunction issued, Watson emailed the captains of various Sea Shepherd vessels and Hartland.  He wrote: "The Japanese whalers are coming. There is no doubt about that.  The question is how do we stop them now?  If we back down to the 9th [Circuit] Court, the whales will die."  The same day, Watson emailed his attorney a proposed press release stating, in part:

> The Sea Shepherd position is clear: Our ships, officers and crew are 100% committed to achieving a zero kill quota on whales.  This is Operation Zero Tolerance and the 120 crew from 26 nations are prepared to risk their lives to defend endangered and protected whales in the Southern Ocean Whale Sanctuary.

Both Sea Shepherd US and Sea Shepherd Australia recognized that the injunction would hinder Sea Shepherd US's ability to lead OZT.  Shortly after the injunction was issued, Hansen, a board member of Sea Shepherd Australia, emailed Watson and Hartland stating: "As the injunction that has been put in place by the US Federal court impedes SSCS's ability to save the lives of whales, we need another body other than SSCS to step in and take over for whales."

Sea Shepherd US ceded control of OZT to Sea Shepherd Australia on the belief that Sea Shepherd Australia was not bound by the injunction.  Shortly after the injunction issued,

Watson wrote a proposal to Sea Shepherd US's board stating in part:

> The decision by the other organizations to comply with the injunction rests with the Board of Directors of the Sea Shepherd organizations registered under the laws of their respective nations. The orders of the 9th U.S. [Circuit] Court cannot possibly restrict them and this especially so with Sea Shepherd Australia where the Japanese fleet is seen to be operating in direct defiance of the Australian Federal Court and is presently in contempt of this court ruling.

Sea Shepherd Australia also believed that it was not bound by the injunction. In the weeks following the issuance of the injunction, Sea Shepherd Australia board member John McMullan, an attorney, and Melbourne barrister Debbie Mortimer, with whom he consulted, concluded that the injunction did not bind the organization. Both believed that Australian courts were unlikely to enforce the injunction because of an Australian federal court order enjoining the Plaintiffs from conducting whaling operations in the Southern Ocean Whale Sanctuary. In the early days after the injunction was handed down, Bob Brown, who would soon assume leadership over OZT, visited one of the OZT ships to reassure the crew that the injunction would not impede Sea Shepherd Australia's ability to proceed with OZT.

Sea Shepherd US's board knew it was highly likely that Sea Shepherd Australia and other entities would commit acts that violated the injunction during OZT. This was conceded by counsel at oral argument when he stated that Sea Shepherd

US board members "knew [the *Bob Barker*, which the board granted to Sea Shepherd Netherlands for no consideration,] would be used in OZT, and there was a very high risk it would violate the injunction."

When the injunction issued on December 17, 2012, Sea Shepherd US was leading OZT with Watson serving as the campaign leader and captain of the *Steve Irwin*.  Yet, Sea Shepherd US did not respond to the injunction by attempting to prevent people and equipment under its control from participating in the campaign. Watson, as Executive Director of Sea Shepherd US, did not use his authority to withdraw the *Steve Irwin* from OZT after the injunction issued.  Instead, he remained in charge of the campaign and captain of the *Steve Irwin* until late December, when he turned the campaign over to Sea Shepherd Australia.  In his testimony before the Appellate Commissioner, Watson conceded that he could have remained in control of the OZT vessels after the injunction and tried to make sure that they complied.  Sea Shepherd US had a number of employees working on OZT when the injunction issued, including Peter Hammarstedt, the Director of Marine Operations and captain of the *Bob Barker.* Sea Shepherd US did not order these employees to leave the ships.  Nor did it order them to withdraw the ships from the OZT campaign.  It would have been perfectly reasonable for Sea Shepherd US to do so in order to ensure that these vessels and employees did not subsequently violate the injunction. *Cf. In re Transamerica Corp.*, 184 F.2d 319 (9th Cir. 1950) (bank held in contempt for failing to countermand instructions to acquire bank branches, even though all necessary steps had been taken prior to injunction); *see also* 2 James L. High & Shirley T. High, *A Treatise on the Law of Injunctions* 1448 (4th ed. 1905) ("It is the clear duty of one who is enjoined from the commission of a particular act not

only to refrain from doing the act in person, but also to restrain his employees from doing the thing forbidden, and a mere passive and personal obedience to the order will not suffice.").

Sea Shepherd US eventually stopped paying the salaries of crew members participating in OZT, but many of them, including Hammarstedt, continued to participate in the OZT campaign. Sea Shepherd US gave Hammarstedt and two other former employees participating in OZT three months of "severance" pay after they resigned. Importantly, after Watson resigned from his roles with Sea Shepherd US, he requested that arrangements be made for the crew aboard the ships to be paid by other Sea Shepherd entities. Rather than instruct its employees to help prevent OZT, Sea Shepherd US effectively shifted these employees to its affiliates' payrolls to ensure continued participation in a campaign it knew was very likely to result in violations of the injunction.

In sum, Sea Shepherd US wanted OZT to continue; knew that the injunction would prevent it from leading the OZT campaign effectively; believed that Sea Shepherd Australia was beyond the reach of the injunction; and knew that Sea Shepherd Australia held the same belief. It also knew that there was a high risk that other Sea Shepherd entities would violate the terms of the injunction if OZT proceeded as planned. Sea Shepherd US's decision to withdraw from OZT, relinquishing any ability to take reasonable steps to prevent other Sea Shepherd entities from violating the injunction, must be viewed with these background facts in mind. Sea Shepherd US did not so much withdraw from OZT as turn the campaign and millions of dollars of assets over to entities it knew would do what the injunction forbade Sea Shepherd US and Watson from doing directly.

**B.  Sea Shepherd US's Post-Injunction Assistance to OZT**

Despite the ample evidence that Sea Shepherd US withdrew from OZT to ensure that it proceeded unhindered, our decision to hold Sea Shepherd US in contempt does not rest solely on its failure to take steps to prevent violations of our injunction.  Our decision is primarily compelled instead by the undisputed evidence noted *infra* that Sea Shepherd US continued to provide material support to OZT after the injunction issued, confident that the entities it assisted would likely violate the injunction.

A party "may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Regal Knitwear Co.*, 324 U.S. at 14.  As a result, a party to an injunction who assists others in performing forbidden conduct may be held in contempt, even if the court's order did not explicitly forbid his specific acts of assistance.  *See NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 413 (1960) (Frankfurter, J., concurring) (observing that "[e]very affirmative order in equity carries with it the implicit command to refrain from action designed to defeat it"); *United States v. Shipp*, 214 U.S. 386, 422–23 (1909) (holding sheriff in contempt for failing to prevent lynching and observing that he "in effect aided and abetted it"); *Roe v. Operation Rescue*, 919 F.2d 857, 871 (3d Cir. 1990) ("The law does not permit the instigator of contemptuous conduct to absolve himself of contempt liability by leaving the physical performance of the forbidden conduct to others.  As a result, those who have knowledge of a valid court order and abet others in violating it are subject to the court's contempt powers."); *NLRB v. Laborers' Int'l Union of N. Am., AFL-CIO*, 882 F.2d 949, 954 (5th Cir. 1989)

("One need not commit an unlawful act in order to be liable for conspiring to evade a judgment of a court: it is contempt to act solely for the purpose of evading a judgment.").

### 1.    Post-Injunction Payments for OZT Expenses

Sea Shepherd US incurred substantial expenses related to OZT after the injunction issued.  $348,565 of those expenses were for orders placed before the injunction was issued, but paid afterwards.  Sea Shepherd US took no steps to rescind the orders, divert delivery to a third party, or charge for their use.  Moreover, other OZT-related expenses were both ordered and paid for after the injunction issued on December 17, 2012.  For instance, an order of $106,830 in fuel for the *Steve Irwin* was invoiced on December 31, 2012, paid for by Sea Shepherd US that day, and delivered in January of 2013.  Between January 1 and 16, 2013, Sea Shepherd US paid $16,373 in credit card charges of the captains of vessels involved in OZT.  In all, Sea Shepherd US paid $163,405 in OZT- related expenses that were invoiced and paid for by Sea Shepherd US after the issuance of the injunction.  Sea Shepherd US and the individual board members confirmed through their counsel at oral argument the accuracy of the $163,405 figure.

### 2.    Donations to OZT

Watson helped facilitate donations to OZT after the injunction issued.  On December 28, 2012, Watson wrote an email to a Sea Shepherd US fundraiser, stating:

> You can continue to fund raise for Sea Shepherd USA but not to ask for funds for Operation Zero Tolerance. If people wish to

> restrict a donation to Operation Zero
> Tolerance they can do so but it will have to be
> made out to Sea Shepherd Australia and there
> can be no tax receipt.
>
> Rob Holden has a 501(c)(3) organization
> called Blue Rage and if need be donations can
> be made to Blue Rage and Blue Rage can
> send it on toe [sic] Sea Shepherd Australia.

Thus, even though Sea Shepherd US was unable to collect tax-deductible charitable donations for use in OZT, Watson proposed routing such donations to OZT through a separate 501(c)(3) nonprofit entity.

### 3.  Asset Grants to OZT for No Consideration

Sea Shepherd US's most troubling post-injunction support for OZT came in a series of substantial grants of property it made to various Sea Shepherd entities participating in the OZT campaign.  In January of 2013, the Sea Shepherd US board authorized a series of grants to Sea Shepherd Australia and Sea Shepherd Netherlands.  Specifically, Sea Shepherd US gave equipment aboard the *Brigitte Bardot* to Sea Shepherd Australia for no consideration.  This equipment had an original purchase price of more than $175,000.  Sea Shepherd US also gave equipment aboard the *Steve Irwin* to Sea Shepherd Netherlands, again for no consideration.  This equipment had an original purchase price of several hundreds of thousands of dollars.  Most significantly, Sea Shepherd US also transferred ownership of its vessel, the *Bob Barker*, to Sea Shepherd Netherlands for no consideration.  As noted earlier, the *Bob Barker* and the transferred equipment had a total original purchase price of nearly two million dollars.

The *Brigitte Bardot*, *Steve Irwin*, and *Bob Barker* all participated in OZT. Each vessel was involved in at least one violation of the injunction; the *Bob Barker* was involved in several.

The Sea Shepherd US board knew that these items would be used in OZT when it voted to grant them to Sea Shepherd Australia and Sea Shepherd Netherlands. The email asking the board members to vote on the grants stated "[p]lease consider this grant *in conjunction with Operation Zero Tolerance*." Sea Shepherd US board member Robert Wintner testified that he understood this email to mean that the granted items would be used for OZT. And, if this evidence leaves any doubt, Sea Shepherd US and the individual board members conceded at oral argument through their counsel that the board knew that the equipment would be used in OZT, and that there was a "very high risk" that the *Bob Barker* would violate the injunction.

In light of this undisputed evidence, we hold that Sea Shepherd US violated the injunction by giving others it knew were highly likely to violate the injunction the means to do so. The fact that the injunction's terms did not specifically forbid Sea Shepherd US's acts of assistance does not immunize Sea Shepherd US from liability. "In deciding whether an injunction has been violated it is proper to observe the objects for which the relief was granted and to find a breach of the decree in a violation of the spirit of the injunction, even though its strict letter may not have been disregarded." *John B. Stetson Co. v. Stephen L. Stetson Co.*, 128 F.2d 981, 983 (2d Cir. 1942); *see Prang Co. v. Am. Crayon Co.*, 58 F.2d 715 (3d Cir. 1932); *Cal. Fruit Growers Exch. v. Sunkist Drinks, Inc.*, 25 F. Supp. 401 (S.D.N.Y. 1938); *see also Salazar v. Buono*, 559 U.S. 700, 762 (2010)

(Breyer, J., dissenting) (citing *Stetson Co.*, 128 F.2d at 983). Our objective in issuing the injunction was to stop Sea Shepherd from attacking the Plaintiffs' vessels.     Sea Shepherd US thwarted that objective by furnishing other Sea Shepherd entities with the means to do what it could not after the issuance of the injunction.

It has long been settled law that a person with notice of an injunction may be held in contempt for aiding and abetting a party in violating it.  *See Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1323–24 (9th Cir. 1998) (citing *NLRB v. Sequoia Dist. Council of Carpenters*, 568 F.2d 628, 633 (9th Cir. 1977)); *Laborers' Int'l Union of N. Am., AFL-CIO*, 882 F.2d at 954; *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 674 (3d Cir. 1999).  Much of the applicable case law addresses the issue of when it is fair to hold non-parties to an injunction liable for aiding and abetting a party's violation of the injunction.  *See, e.g.*, *Regal Knitwear Co.*, 324 U.S. at 14; *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250–51 (2d Cir. 2002); *Goya Foods, Inc. v Wallack Mgmt. Co.*, 290 F.3d 63, 75 (1st Cir. 2002); *Highland Music*, 140 F.3d at 1323–24; *Illinois v. U.S. Dep't of Health & Human Servs.*, 772 F.2d 329, 332 (7th Cir. 1985); *Waffenschmidt v. MacKay*, 763 F.2d 711, 717 (5th Cir. 1985); *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832–33 (2d Cir. 1930).  It is clear to us that if a non-party to an injunction may be held in contempt for aiding and abetting violations of an injunction, a party to an injunction may be as well.  We therefore hold that a party may be held in contempt for giving a non-party the means to violate an injunction, if the party knows it is highly likely the non-party will use those means to violate the injunction.

Under such circumstances, the party giving assistance need not affirmatively desire to cause a violation of the injunction; it is enough that the party know a violation is highly likely to occur.  In so ruling, we are guided by common law rules of fault-based liability.  "Tort law ordinarily imputes to an actor the intention to cause the natural and probable consequences of his conduct."  *DeVoto v. Pacific Fidelity Life Ins. Co.*, 618 F.2d 1340, 1347 (9th Cir. 1980) (citing Restatement (Second) of Torts § 8A (1965)). "Intent is not . . . limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result."  Restatement (Second) of Torts § 8A(b) (1965).  We have adopted a similar definition of intent outside the common law tort context.  For instance, we employed it when we defined the elements of contributory infringement of copyright in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1170–71 (9th Cir. 2007), where we observed that "common law principles establish that intent may be imputed."  *See also Metro-Goldwyn-Mayer Studios Inc. v. Grokster Ltd.*, 545 U.S. 913, 934–35 (2005) (endorsing the use of "rules of fault-based liability derived from the common law" in assessing liability for contributory infringement).  Under these circumstances, we find it appropriate to impute to Sea Shepherd US an intent to cause a violation of the injunction, regardless of whether Sea Shepherd US affirmatively desired that a violation occur.

We also find it relevant that Sea Shepherd US's acts of assistance proximately caused violations of the injunction. We are once again guided by principles derived from common law rules of fault-based liability.  The Supreme Court recently summarized the principles of proximate

causation in *Paroline v. United States*, 134 S. Ct. 1710, 1719 (2014).  "As a general matter, to say one event proximately caused another is a way of making two separate but related assertions.  First, it means the former event caused the latter.  This is known as actual cause or cause in fact." *Id*.  Second, it means the former event was "not just any cause, but one with a sufficient connection to the result." *Id*.

We begin this portion of our analysis by asking whether Sea Shepherd US's assistance actually caused violations of the injunction.  "The concept of actual cause 'is not a metaphysical one but an ordinary, matter-of-fact inquiry into the existence . . . of a causal relation as laypeople would view it.'" *Id*. (quoting 4 F. Harper, F. James, & O. Gray, Torts § 20.2, p. 100 (3d ed. 2007)).  We need not assess whether Sea Shepherd US's acts caused each and every violation of the injunction.  At a minimum its transfer of ownership and control of the *Bob Barker* to Sea Shepherd Netherlands caused the violations involving the *Bob Barker*.  The foreign Sea Shepherd entities could not have used the vessel to violate the injunction if they did not control it.

We next inquire whether Sea Shepherd US's conduct had a "sufficient connection to" violations of the injunction. *See Paroline*, 134 S. Ct. at 1719.  In applying this "flexible concept," *id*. (internal quotation marks omitted), we are mindful of its purpose: "A requirement of proximate cause . . . serves, *inter alia*, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Id*. (citing *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 838–39 (1996)).  For this reason, "[p]roximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct." *Paroline*,

134 S. Ct. at 1719 (citing 1 Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 29, p. 493 (2005)).

We have no trouble finding a sufficient causal connection between Sea Shepherd US's intentional conduct and violations of the injunction. Sea Shepherd US knew that there was a very high risk that foreign Sea Shepherd entities would use the *Bob Barker* to violate the injunction. It was clearly foreseeable that transferring the ownership and control of the vessel to Sea Shepherd Netherlands in order that it participate in OZT would result in violations of our injunction.

The fact that the foreign Sea Shepherd entities had a more direct role in causing the violations than Sea Shepherd US does not negate the causal connection between Sea Shepherd US's acts and the violations of our injunction. An event may have multiple proximate causes. *See id.* ("Every event has many causes . . . and only some of them are proximate, as the law uses that term."); *Sheridan v. United States*, 487 U.S. 392, 406 (1988) (Kennedy, J., concurring) ("It is standard tort doctrine that a reasonably foreseeable injury can arise from multiple causes, each arising from a breach of a different duty and each imposing liability accordingly."); *see also Lillie v. Thompson*, 332 U.S. 459, 461–62 (1947) (per curiam). As we have observed in applying California tort law, "the fact that the actor's conduct becomes effective in harm only through the intervention of new and independent forces for which the actor is not responsible is of no importance." *Bank of N.Y. v. Fremont Gen. Corp.*, 523 F.3d 902, 910 (9th Cir. 2008) (quoting *Tate v. Canonica*, 180 Cal. App. 2d 898, 907 (1960)). "[N]o consideration is given to the fact that . . . the actor's conduct has created a situation harmless unless acted

upon by other forces for which the actor is not responsible." *Tate*, 180 Cal. App. 2d at 907 (internal quotation marks omitted).  By analogy, a party who acts knowing that his conduct is highly likely to cause a violation of an injunction may not avoid liability simply because another person outside his immediate control actually carried out the violation.

We are mindful that the contempt power, like other "inherent powers" of the judiciary, "must be exercised with restraint and discretion." *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764–65 (1980) (citing *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 450–51 (1911); *Green v. United States*, 365 U.S. 165, 193–94 (1958) (Black, J., dissenting)). Nevertheless, "[t]he purpose of contempt proceedings is to uphold the power of the court," *Bessette v. W.B. Conkey Co.*, 194 U.S. 324, 327 (1904), and to ensure that the court's vindication of litigants' rights is not merely symbolic.  Our orders would have little practical force, and would be rendered essentially meaningless, if we were unable to prevent parties bound by them from flagrantly and materially assisting others to do what they themselves are forbidden to do.

The Defendants argue that to hold them in contempt for aiding and abetting we must find them "indirectly liable," because "[t]he alleged acts of contempt were committed by third parties."  The Defendants contend that this requires a clear and convincing showing that they "incited" or "controlled" the third-party acts of contempt.  This argument is without merit.

While the record amply supports the inference that Sea Shepherd US, and Watson in particular (discussed *infra*), "incited" others to violate the injunction, a showing of

incitement or control is not required to hold Sea Shepherd US in contempt.  It is not necessary to impute the acts of others to Sea Shepherd US to hold it in contempt; we hold Sea Shepherd US in contempt for the acts *it* committed after the injunction issued.  *See Laborers' Int'l Union of N. Am., AFL-CIO*, 882 F.2d at 954 ("One need not commit an unlawful act in order to be liable for conspiring to evade a judgment of a court: it is contempt to act solely for the purpose of evading a judgment."); *John B. Stetson Co.*, 128 F.2d at 983 (holding that courts may "find a breach of the decree in a violation of the spirit of the injunction, even though its strict letter may not have been disregarded").  As a party to the injunction, Sea Shepherd US is liable because it intentionally furnished cash payments, and a vessel and equipment worth millions of dollars, to individuals and entities it knew would likely violate the injunction.

The out-of-circuit cases Sea Shepherd US cites in support of its incitement and control argument are plainly irrelevant to the issues presented here.  Sea Shepherd US cites a Federal Circuit patent case, *Tegal Corp. v. Tokyo Electron Co., Ltd.*, 248 F.3d 1376, 1378 (Fed. Cir. 2001).  But *Tegal* held only that a party enjoined from "facilitating" infringement of a patent cannot be held in contempt merely for failing to prevent another's infringement, absent an affirmative act of facilitation.  *Id*. at 1378–80.  This holding is not relevant to our facts, which *do* involve affirmative acts.

Sea Shepherd US's citation to *National Organization for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001), *rev'd on other grounds*, 537 U.S. 393 (2003), is also unavailing. The injunction in *Scheidler* explicitly prohibited the defendants from "aiding, abetting, inducing, directing, or inciting" others to violate the injunction.  *Id*. at 705.  The

*Scheidler* defendants argued that the injunction exposed them to liability for the conduct of persons they did not control, and whose actions they did not authorize. *Id*. at 706. The Seventh Circuit disagreed, finding that "[n]othing in the order purports to hold the defendants liable for actions they do not direct, incite, or control." *Id*. at 707. Even if *Scheidler*'s narrow holding about the specific terms of one injunction could be construed broadly as a holding about the general law of contempt for aiding and abetting, and it clearly cannot, the holding would not apply here. We do not purport to hold any of the Defendants liable for actions they did not direct, incite, or control. Rather, we hold them liable only for their own intentional acts in furtherance of OZT. A party bound by an injunction may not provide a non-party with the means to violate it, knowing the non-party will be likely to do so.

Sea Shepherd US also argues that contempt for aiding and abetting requires a showing that a third-party's violations were "for the benefit of, or to assist" Sea Shepherd US. But the out-of-circuit case Sea Shepherd US cites in support of this argument is clearly inapposite. *See Goya Foods, Inc.*, 290 F.3d at 75. *Goya Foods* addresses when a *non-party* to an injunction may be held in contempt for conduct that would violate the injunction if performed by a party bound by it. *Id*. The First Circuit held that, to be liable for civil contempt, a non-party's "challenged action must be taken for the benefit of, or to assist, a party subject to the decree." *Id*. This requirement, like Rule 65's requirement that a person cannot be bound by an injunction unless he is in "active concert or participation with" a party, is animated partly by due process concerns raised when courts seek to bind a non-party. *See* Fed R. Civ. P. 65(d)(2)(C); *Max's Seafood Cafe ex rel. Lou-Ann, Inc.*, 176 F.3d at 674. Holding Sea Shepherd US in contempt for violating an injunction to which it is a party

raises no analogous due process concerns. Sea Shepherd US's liability for intentionally assisting non-parties to violate an injunction by which it is clearly bound does not depend on whether the non-parties violated the injunction for Sea Shepherd US's benefit, or their own, or for no reason at all.

The Defendants also argue that they should not be held in contempt because the so-called "separation strategy" was based on a reasonable and good faith interpretation of the injunction. We reject this argument.

It is true that we have recognized a narrow "good faith" exception to the general rule that intent is irrelevant in civil contempt proceedings. *See Vertex*, 689 F.2d at 889. We held in *Vertex* that "if a defendant's action appears to be based on a good faith and reasonable interpretation of (the court's order), he should not be held in contempt." *Id*. (internal quotation marks omitted). By its terms, the *Vertex* exception only applies where a defendant's interpretation is "reasonable." Parties who act on the unreasonable advice of counsel risk being held in contempt if their actions violate a court's order.

The facts of this case, however, do not require a *Vertex* inquiry into the reasonableness of the Defendants' interpretation of our injunction. The principle announced in *Vertex* was based on the well-established rule that a "vague" order may not be enforced. *See id*. (citing *Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967) (reversing a civil contempt judgment founded upon a decree too vague to be understood)). In *Vertex*, the parties disputed whether the words "includes" and "incorporating" in the consent judgment were impermissibly vague. 689 F.2d at 890. The

case thus involved a "semantic battle" about the meaning of allegedly vague terms in the language of the judgment. *See id*.

No such "semantic battle" is at issue here. The meaning of the text of the injunction is not disputed by any of the parties. No one contends that the injunction's text states, in so many words, that Sea Shepherd US may not donate millions of dollars of equipment to entities it knows are likely to violate the injunction. And no one contends that the text states that Sea Shepherd US may not continue to fund OZT, knowing that violations of the injunction were likely to occur if the campaign proceeded unabated. The *language* of the injunction itself is not ambiguous. What the Defendants claim is ambiguous, however, is whether they could avoid liability by hewing to the narrow letter of the injunction while simultaneously ignoring its spirit by giving substantial assistance to OZT. *Vertex* is not relevant to resolving such an "ambiguity."

Even if the *Vertex* exception were applicable here, we would find that the Defendants unreasonably resolved the "ambiguity." In making this determination, we are guided by the Supreme Court's commentary in *McComb v. Jacksonville Paper Co*., 336 U.S. 187 (1949). In *McComb*, the Court reversed a district court's decision declining to enforce an injunction that prohibited a party from violating the Fair Labor Standards Act. *Id*. at 194. Both the district court and the court of appeals found that the alleged contemnor's specific conduct did not violate the injunction's general prohibition against violations of the FLSA. *Id*. at 190–91. Noting that the respondents "acted at their peril" when they "undertook to make their own determination of what the decree meant," *id*. at 192, the Court reasoned:

> It does not lie in their mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined. Such a rule would give tremendous impetus to the program of experimentation with disobedience of the law which we condemned in *Maggio v. Zeitz*[1] . . . . The instant case is an excellent illustration of how it could operate to prevent accountability for persistent contumacy. Civil contempt is avoided today by showing that the specific plan adopted by respondents was not enjoined. Hence a new decree is entered enjoining that particular plan. Thereafter the defendants work out a plan that was not specifically enjoined. Immunity is once more obtained because the new plan was not specifically enjoined. And so a whole series of wrongs is perpetrated and a decree of enforcement goes for naught.

*Id*. at 192–93.

To find the Defendants' self-serving interpretation of their obligations under our injunction reasonable would be to invite "experimentation with disobedience." The schemes available to those determined to evade injunctions are many and varied, *see, e.g.*, *Deena Artware, Inc.*, 361 U.S. at 398; *Laborers' Int'l Union of N. Am., AFL-CIO*, 882 F.2d at 954; *Parker v.*

---

[1] 333 U.S. 56, 69 (1948) (observing in different context that "[t]he procedure to enforce a court's order commanding or forbidding an act should not be so inconclusive as to foster experimentation with disobedience").

*United States*, 126 F.2d 370 (1st Cir. 1942), and no injunction can explicitly prohibit every conceivable plan designed to defeat it.  Though they had every opportunity, the Defendants did not seek clarification of their obligations.  *See McComb*, 336 U.S. at 192 (noting that the respondents could have avoided appeal by simply petitioning for "modification, clarification or construction of the order").  By construing their obligations narrowly to include only refraining from acts specifically enumerated in the injunction, and not acts likely to nullify the injunction, the Defendants assumed the risk that their attempts at technical compliance would prove wanting. We accordingly reject the Defendants' good faith argument, and hold Sea Shepherd US in civil contempt.

## II.  Volunteer Board Members

The Plaintiffs have also moved for contempt against Sea Shepherd US's volunteer board members based on their ratification of the separation strategy, and their approval of transfers of ownership of valuable property, for no consideration, to Sea Shepherd entities participating in OZT. At the time the injunction issued, the volunteer board members were Lani Blazier, Marnie Gaede, Bob Talbot, Robert Wintner, Ben Zuckerman, and Peter Rieman.  Having found Sea Shepherd US liable for civil contempt, we also hold the board members just named in civil contempt.

The law is clear that those who control an organization may be held liable if they fail to take appropriate action to ensure compliance with an injunction:

> A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs.  If

> they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt.

*Wilson v. United States*, 221 U.S. 361, 376 (1911). There is no dispute that the individual board members knew of the injunction and voted to implement the separation strategy, including the transfer of property for no consideration to Sea Shepherd Australia and Sea Shepherd Netherlands.

The Appellate Commissioner made much of the volunteer directors' reliance on the advice of counsel, and the Defendants urge us to do the same. But the Commissioner's conclusion that the volunteer directors intended to comply with the injunction is at odds with Sea Shepherd US's subsequent concession at oral argument that the board knew there was a "very high risk" the vessel and equipment it provided would be used to violate the injunction. Under the circumstances, it is simply not credible that the volunteer directors believed they were complying with the injunction when they agreed to grant, for no consideration, millions of dollars of equipment and materials needed to carry out OZT to entities they believed would be highly likely to use those materials to violate the injunction.

Moreover, even if we were to assume, *arguendo*, that the volunteer directors truly acted in reliance on counsel's advice, that reliance is largely irrelevant. There is "no basis in law" for a "'good faith' exception to the requirement of obedience to a court order." *In re Crystal Palace Gambling Hall, Inc.*,

817 F.2d 1361, 1365 (9th Cir. 1987).  A party's good faith reliance on the advice of counsel does not excuse the violation of a court's order.  *See Steinert v. United States*, 571 F.2d 1105, 1108 (9th Cir. 1978) (holding that "[d]isobedience of a valid court order does not cease to be willful when done in good faith reliance on the advice of a tax accountant"); *Eustace v. Lynch*, 80 F.2d 652, 656 (9th Cir. 1935) (holding that the "advice of an attorney is not a defense to an act of contempt"); *see also United States v. Asay*, 614 F.2d 655, 661 (9th Cir. 1980) (holding that defiance of summonses was "willful despite the advice of counsel" (citing *Steinert*, 571 F.2d at 1108)).  As we observed in *Steinert*, "[t]o hold otherwise would make stultification of a court order impermissibly easy.  In litigation frequently the client must assume the risks of his advisor's errors."  571 F.2d at 1108. Accordingly, the volunteer directors may be held liable for contempt.

## A.  Peter Rieman

Peter Rieman stands in a somewhat different position than the other named board members.  Rieman resigned from the board on February 11, 2013, following the first alleged violation of the injunction on January 29, 2013.  Rieman was concerned that he had no control over the actions of those involved in OZT and was worried that he faced personal exposure for subsequent violations of the injunction.

The Appellate Commissioner concluded correctly that "[i]f SSCS's actions (and inactions) put it in contempt, then [Rieman] is as liable as the other Volunteer Directors."  It is true that Rieman lacked control over Sea Shepherd US after he resigned in February 2013.  But by that time, he had already voted to ratify and implement the separation strategy,

and an OZT vessel had already breached the safety perimeter imposed by our injunction.  Rieman's resignation therefore does not immunize him from liability for contempt.[2]

## B.  Volunteer Protection Act

The volunteer directors argue that the provisions of the Volunteer Protection Act (VPA), 42 U.S.C. § 14503, immunize them from a finding of contempt.  We reject this argument, and hold that the VPA does not affect the power of federal courts to impose civil fines to redress contempt.

Under some circumstances, the VPA immunizes volunteers from liability for harm caused by actions taken within the scope of their volunteer responsibilities. The VPA provides in relevant part:

> [N]o volunteer of a nonprofit organization or governmental entity shall be liable for harm caused by an act or omission of the volunteer on behalf of the organization or entity if–
>
> (1) the volunteer was acting within the scope of the volunteer's responsibilities in the nonprofit organization or governmental entity at the time of the act or omission;
>
> [and] . . .

---

[2] This finding of contempt as to Rieman does not, however, preclude the taking into account of his early resignation by way of mitigation when appropriate remedial sanctions are considered under Part V, below.

(3) the harm was not caused by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the volunteer . . . .

42 U.S.C. § 14503(a).

The Plaintiffs raise a host of arguments why the volunteer directors do not qualify for immunity under the VPA. The Plaintiffs contend that the attorney's fees they seek are not "harm" under § 14503(a); that the board members' misconduct was willful under § 14503(a)(3); and that they did not act within the scope of their responsibilities under § 14503(a)(1) when they ratified the separation strategy. We need not address these arguments, for we hold that the VPA does not affect our power to hold those bound by our injunction in contempt.

We find it highly improbable that when Congress passed the VPA, it intended to prohibit federal courts from finding volunteer board members liable for their acts of contempt.[3] The text of the VPA does not specifically mention courts' equity jurisdiction or their contempt powers. Nor does the VPA's legislative history provide support for the conclusion that Congress's purposes included curbing the judicial power

---

[3] The parties largely focus their arguments on whether the VPA applies to federal causes of action, in addition to state causes of action. But whether the VPA applies to federal causes of action is not directly relevant to whether the VPA circumscribes federal courts' contempt power, and the cases cited are inapposite. *See Armendarez v. Glendale Youth Ctr., Inc.*, 265 F. Supp. 2d 1136, 1140 (D. Ariz. 2003); *Nunez v. Duncan*, 2004 WL 1274402, at *1 (D. Or. June 9, 2004); *Am. Produce, LLC v. Harvest Sharing, Inc.*, 2013 WL 1164403, at *3 (D. Colo. Mar. 20, 2013).

to enforce orders through contempt.  The Committee on the Judiciary's report observed that "H.R. 911, as amended, immunizes a volunteer from liability for harm caused by *ordinary negligence*."  H.R. Rep. 105-101(I) at 5 (emphasis added).  The committee report also speaks of the "litigation craze" and "[o]ur 'sue happy' culture."  *Id*.  It explains that the VPA is "intended to remove a significant barrier—the fear of *unreasonable* legal liability—to inducing individuals to volunteer their time to charitable endeavors."  *Id.* (emphasis added).  These references indicate that the VPA's purpose was to curb lawsuits against volunteers, not to curb courts' contempt power.

The importance of the power of courts to punish for contempt makes it highly unlikely that Congress would curtail that power without explicitly indicating its intention.  "[T]he power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law."  *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911).  This power is "inherent in all courts."  *Michaelson*, 266 U.S. at 65.  We acknowledge that Congress may limit lower federal courts' exercise of the contempt power.  *See, e.g.*, *Bessette v. W. B. Conkey Co.*, 194 U.S. 324 (1904); *Ex Parte Robinson*, 86 U.S. 505 (1873).  "Nevertheless, 'we do not lightly assume that Congress has intended to depart from established principles' such as the scope of a court's inherent power."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991) (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 313 (1982)); *see also Link v. Wabash R.R. Co.*, 370 U.S. 626, 631–32 (1962).  Absent a "much clearer expression of purpose," *see Link*, 370 U.S. at 631–32, we will not assume that Congress intended to limit our inherent power to punish contempt.

We accordingly hold that the VPA does not reach federal courts' power to find volunteer board members in contempt of their orders.  Accordingly, the VPA does not immunize Sea Shepherd US's volunteer board members from liability for contempt.

### III.    Watson

In addition to holding Watson in contempt as the Executive Director of Sea Shepherd US, we hold him in contempt for personally violating the injunction by coming within 500 yards of one of the Plaintiffs' vessels.

Unlike the other individual respondents, Watson was present in the Southern Ocean aboard the *Steve Irwin* during the entire OZT campaign.  Watson claimed to believe that he could stay on the *Steve Irwin*, acting as an observer, and remain in compliance with the injunction.  Chakravarty, the captain of the *Steve Irwin*, assured Watson that the ship would not approach within 500 yards of the whaling vessels. The two developed a contingency plan in the event that the *Steve Irwin* looked like it might breach the 500-yard safety perimeter.   Under the plan, Chakravarty would transfer Watson to the *Brigitte Bardot* prior to any encounter.  This plan proved unworkable in practice.  Chakravarty abandoned the plan to transfer Watson in mid-February when he and the other captains attempted a blockade to prevent one of the Plaintiffs' vessels from refueling.  As a result, Watson personally came within 500 yards of the Plaintiffs' whaling vessel while on board the *Steve Irwin*.

Watson testified that he did not disembark the *Steve Irwin* because he believed that he risked detention or extradition if he did so in Australia or New Zealand, the only two countries

within 1000 miles of the *Steve Irwin*'s position.  When the injunction issued, Watson was subject to an INTERPOL red notice for criminal charges he faced in Japan.  But there was strong evidence that Watson was unlikely to be extradited from Australia, and that he knew it.  Sea Shepherd was very popular in Australia, and Watson's Australian attorney had advised him that the risk of arrest and extradition by Australia was remote.

We find that Watson failed to take all reasonable steps within his power to comply with the injunction.  A reasonable person in Watson's position would not have tried to evade a warrant for his arrest while also risking being held in contempt.   To hold otherwise would be to condone as reasonable Watson's attempt to evade the criminal charges he was facing.  We accordingly hold Watson in civil  contempt for coming within 500 yards of Plaintiffs' vessels.

## IV.    Hartland

The Plaintiffs also request that Hartland, Sea Shepherd US's Administrative Director, be held in contempt.  Hartland is in a different position than the other individual respondents.  She was not a member of Sea Shepherd US's board, and accordingly did not vote to ratify the separation strategy.  As the Appellate Commissioner found, "[t]here is no evidence that Hartland took any action in response to the injunction that was not authorized by the SSCS board."  This alone does not immunize Hartland from contempt, for our injunction explicitly bound not just Sea Shepherd US and Watson, but those acting "in concert" with them.  However, unlike the volunteer board members, Hartland could only have complied with the injunction by resigning from her paid employment.  Under the specific circumstances of this case,

we conclude that it would not be equitable to hold Hartland in contempt.

## V. Appropriate Remedial Sanctions

The Plaintiffs request three forms of relief to redress the Defendants' contempt: (1) attorney's fees and costs as compensation for bringing the Defendants' acts of contempt to the attention of the court; (2) bonded, suspended sanctions in the amount of $2 million or such amount the court deems appropriate; and (3) an order directing that the Defendants may purge themselves of contempt by seeking in good faith to revoke their grants of property to Sea Shepherd entities.

We hold that the Plaintiffs are entitled to recover attorney's fees and costs incurred in bringing and prosecuting these contempt proceedings. "[T]he cost of bringing the violation to the attention of the court is part of the damages suffered by the prevailing party and those costs would reduce any benefits gained by the prevailing party from the court's violated order." *Perry v. O'Donnell*, 759 F.2d 702, 705 (9th Cir. 1985). At a minimum, the Plaintiffs shall recover their fees and costs against Sea Shepherd US and Watson. The Plaintiffs are also entitled to compensation for any actual damages suffered and resources (such as fuel and personnel costs) that were wasted as a result of the Defendants' contumacious acts interfering with the Plaintiffs' mission. We will re-refer this matter to the Appellate Commissioner to determine the appropriate amount of attorney's fees and costs as well as compensatory damages to award. The Commissioner shall determine whether the volunteer directors should also be held liable, and the extent to which each of them should be held liable, jointly and/or severally.

The Plaintiffs' requests for coercive sanctions and an order to compel compliance should be directed to the district court. Our opinion of February 25, 2013, as amended May 24, 2013, provided that the preliminary injunction "will remain in effect until further order of this court." *Inst. of Cetacean Research*, 725 F.3d at 947. However, we issued our mandate on June 7, 2013, at which time the district court assumed supervision over the Defendants' present compliance with the preliminary injunction. While we retain jurisdiction to order remedial relief for acts of contempt that took place prior to the issuance of our mandate, because these coercive sanctions are forward-looking, we believe that policing the Defendants' continuing compliance with the preliminary injunction is better left to the district court, subject to our review on appeal. This panel retains jurisdiction over all appeals in this case.

## CONCLUSION

We hold Sea Shepherd Conservation Society, Paul Watson, Lani Blazier, Marnie Gaede, Bob Talbot, Robert Wintner, Ben Zuckerman, and Peter Rieman in civil contempt. We do not hold Susan Hartland in contempt. We re-refer this matter to the Appellate Commissioner for further proceedings in a separate order filed contemporaneously.

**IT IS SO ORDERED.**