**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1197**

WILLIAM HAWKINS; ERIC KELLER; THOMAS ZATO; KRISTOF GABOR;
JUSTIN PANCHLEY,

Plaintiffs – Appellants,

v.

I-TV DIGITALIS TAVKOZLESI ZRT., f/k/a DMCC Kommunikacios Rt.,

Defendant – Appellee,

DIGI TAVKOZLESI ES SZOLGALTATO KFT.; RCS & RDS S.A.; RCS
MANAGEMENT S.A.; DIGI COMMUNICATIONS, N.V.; ZOLTAN TESZARI,

Respondents – Appellees,

and

LASZLO BORSY; MEDIAWARE CORPORATION; MEDIATECHNIK KFT.;
PETERFIA KFT.; SAM BLACK,

Defendants.

**No. 18-1288**

WILLIAM HAWKINS; ERIC KELLER; THOMAS ZATO; KRISTOF GABOR;
JUSTIN PANCHLEY,

Plaintiffs – Appellees,

v.

I-TV DIGITALIS TAVKOZLESI ZRT., f/k/a DMCC Kommunikacios Rt.,

Defendant – Appellant,

DIGI TAVKOZLESI ES SZOLGALTATO KFT.; RCS & RDS S.A.; RCS MANAGEMENT S.A.; DIGI COMMUNICATIONS, N.V.; ZOLTAN TESZARI,

Respondents – Appellants,

and

LASZLO BORSY; MEDIAWARE CORPORATION; MEDIATECHNIK KFT.; PETERFIA KFT.; SAM BLACK,

Defendants.

---

Appeal from the United States District Court for the Eastern District of Virginia at Alexandria. Leonie M. Brinkema, District Judge. (1:05-cv-01256-LMB-JFA)

---

Argued: January 31, 2019                                    Decided: August 15, 2019

---

Before WYNN, DIAZ, and RICHARDSON, Circuit Judges.

---

Reversed and remanded by published opinion. Judge Richardson wrote the opinion, in which Judge Wynn and Judge Diaz concurred.

---

**ARGUED:** Robert B. Gilmore, STEIN, MITCHELL, CIPOLLONE, BEATO & MISSNER, LLP, Washington, D.C., for Appellants/Cross-Appellees. Christopher Landau, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Washington, D.C., for Appellees/Cross-Appellants. **ON BRIEF:** Jonathan E. Missner, Brittany W. Biles, Kevin L. Attridge, STEIN, MITCHELL, CIPOLLONE, BEATO & MISSNER, LLP, Washington, D.C., for Appellants/Cross-Appellees. Charles Wm. McIntyre, Jr., Anand V. Ramana, Phillip C. Chang, MCGUIREWOODS, LLP, Washington, D.C., for Appellees/Cross-Appellants RCS & RDS S.A., DIGI Communications, N.V., and Zoltán Teszári. Tara M. Lee, Michael Madigan, Washington, D.C., Carl Hennies, QUINN

2

EMANUEL URQUHART & SULLIVAN, LLP, Houston, Texas, for Appellees/Cross-Appellants i-TV Digitális Távközlési zrt. and DIGI Távközlési és Szolgáltató kft.

RICHARDSON, Circuit Judge:

In this case, we are called upon to decide several jurisdictional issues arising from an international business dispute. Over a decade ago, in 2007, five American Plaintiffs obtained a default judgment against Hungarian businessman László Borsy and several companies he controlled, including one called i-TV Digitális Távközlési zrt. ("i-TV").[1] The judgment afforded the Plaintiffs not just money damages but also injunctive and declaratory relief requiring Borsy to give them a majority interest in i-TV and the other companies. In 2008, some of the Defendants tried to have the judgment set aside, but the district court rejected their efforts in a decision we upheld on appeal. The Plaintiffs, though, found it hard to enforce their judgment against Borsy and the defendant companies, apparently because almost all of their assets were located overseas.

The judgment lay mostly dormant until 2017, when the Plaintiffs moved to enforce it against Defendants Borsy and i-TV along with several foreign Respondents[2] that had bought i-TV from Borsy. The Plaintiffs argued that the Respondents were the Defendants' successors-in-interest and that, by buying i-TV from Borsy, Respondents

---

[1] Like some of the other business entities here, i-TV has changed its name over the course of these protracted proceedings. To avoid further complicating a case that is complex enough, we will ignore all name changes and use only today's names.

[2] While Defendant i-TV was a party to the 2007 judgment, these Respondents were added only in the 2017 attempt to enforce the 2007 judgment. We will use the term "Respondents" to include only those persons who are parties to the motion to enforce but were not parties to the 2007 judgment. Thus, we will not refer to Borsy and i-TV as "Respondents" even though they too were targets of the motion to enforce—instead, we will call them "Defendants."

4

aided and abetted him in violating the injunction. The Respondents, all located overseas, strenuously objected to the district court's personal jurisdiction over them; despite those objections, the district court permitted the Plaintiffs to take extensive discovery from the Respondents.

While discovery was ongoing, the Respondents and i-TV discovered a potential technical defect in subject matter jurisdiction during the initial litigation that led to the 2007 default judgment. On that basis, they moved the court to set aside the default judgment as void under Federal Rule of Civil Procedure 60(b)(4). The district court granted the motion.

The Plaintiffs appeal from the district court's decision finding the 2007 default judgment void for lack of subject matter jurisdiction. They argue that the judgment was not void because there was an arguable (even if erroneous) basis for jurisdiction. We agree with the Plaintiffs and reverse the district court's ruling on the Rule 60(b)(4) motion.

Additionally, the Respondents have filed a cross-appeal challenging the district court's decision to permit extensive discovery from them notwithstanding a lack of personal jurisdiction. The Plaintiffs respond that it is enough to allege that the Respondents aided and abetted Borsy in violating the injunction; such aiding-and-abetting, they argue, is always enough to establish personal jurisdiction. We reject this theory as applied to foreign nonparties like these Respondents. Consider the facts here: the foreign Respondents allegedly helped a foreign national carry out a purely foreign business transaction whose only tie to our country was that it allegedly violated a federal-

court injunction. That is not enough to supply the minimum contacts that due process requires. The Plaintiffs alternatively argue that the Respondents are Borsy's successors-in-interest, but the Plaintiffs have effectively waived that theory by changing their argument on appeal. Therefore, we hold that the district court lacked personal jurisdiction over the Respondents and order them dismissed. On remand, the district court will determine whether and how the matter should proceed against i-TV.

## I.

### A.

In the early 2000s, Borsy controlled three Hungarian business entities: MediaTechnik kft. (a software company), i-TV (the operator of a cable television network in Debrecen, Hungary), and Peterfia kft. (a real estate company that owned the buildings used by MediaTechnik and i-TV). In 2002 and 2003, Borsy sold roughly one-third of MediaTechnik and Peterfia to an American, Plaintiff William Hawkins, in exchange for an investment of $330,000.

Not long afterward, Borsy proposed a "roll-up" transaction in which MediaTechnik, i-TV, and Peterfia would be placed under a single parent company, Mediaware Corporation. He solicited an additional $1 million from Hawkins and, in return, promised Hawkins a 49% stake in Mediaware. He also invited four other Americans to participate in the roll-up: Plaintiffs Eric Keller, Thomas Zato, Kristof Gabor, and Justin Panchley, each an executive or engineer in the computer-software industry. Borsy promised each of them an ownership stake of varying size (ranging from

6

0.98% to 8%) in Mediaware, plus a substantial salary, as compensation for working at his companies.

The Plaintiffs claim that they lived up to their end of the bargain but Borsy did not live up to his. Instead, they claim, he absconded with their money and the fruits of their labor. Borsy failed to deliver the salaries or shares he had promised to Keller, Zato, Gabor, and Panchley. And while Borsy apparently delivered the Mediaware shares to Hawkins, he never completed the roll-up of i-TV into Mediaware, meaning Hawkins never acquired the indirect ownership interest in i-TV that Borsy had promised. Borsy also allegedly forged a stockholders' agreement authorizing him to vote Hawkins' shares in Mediaware.

In October 2005, all five Plaintiffs filed a civil action against Borsy, Mediaware, MediaTechnik, Peterfia, and i-TV in the Eastern District of Virginia. Their claims included fraud, breach of contract, conversion, breach of fiduciary duty, and unjust enrichment. They requested, among other things, an order that Borsy and the companies give them the shares that they had been promised.

The Defendants failed to timely answer the complaint, and default was entered against them. In April 2006, the Defendants finally appeared through counsel and successfully moved to set aside the default. Peterfia and i-TV then moved to dismiss for lack of personal jurisdiction, while Borsy, Mediaware, and MediaTechnik answered the complaint. The district court denied i-TV and Peterfia's motion to dismiss without prejudice, and the case proceeded to discovery.

The Defendants' participation in the litigation was short-lived. In May 2006, Defendants' counsel withdrew. The Plaintiffs then moved for a second entry of default due to the Defendants' failure to participate in discovery. The district court granted the motion. Next, the Plaintiffs requested default judgment. That request was referred to a magistrate judge, who recommended entering a default judgment that included over $1.5 million in compensatory relief and an injunction requiring the Defendants to deliver the promised ownership interests.

Soon after, in September 2006, the Plaintiffs filed an emergency motion requesting prompt entry of their requested judgment. They reported that Borsy now claimed to have sold his shares in i-TV, and they sought an immediate injunction to prevent "Borsy's ongoing efforts to dissipate assets rightfully belonging to Plaintiffs and to render any judgment in favor of Plaintiffs meaningless." J.A. 339. The district court granted the request in part: on October 2, 2006, it enjoined the Defendants "from disposing or dissipating any assets, by sale, merger, or otherwise, or from undertaking any transactions out of the ordinary course of business, without the consent of the shareholders holding a majority of the stock in such companies." J.A. 343–44.

In January 2007, the Plaintiffs again requested the prompt entry of default judgment in full. They reported that Borsy had disobeyed the court's injunction by convening an i-TV shareholder meeting and issuing i-TV shares to Respondent DIGI Távközlési és Szolgáltató kft ("DIGI kft."), which thereby became the majority owner of i-TV. In February 2007, the district court entered default judgment, adopting the magistrate judge's recommendation. The judgment, among other things, ordered specific

8

performance of the promised share transfers, awarding the Plaintiffs collectively majority interests in Mediaware, MediaTechnik, i-TV, and Peterfia.  It also enjoined the Defendants "from disposing of or dissipating any assets of the defendant entities and the defendant entities may not engage in any transactions without the consent of plaintiffs William Hawkins, Eric Keller, Kristof Gabor, Justin Panchley, and Thomas Zato."  J.A. 376.  None of the Defendants appealed from the default judgment.

In 2008, three of the Defendants—Mediaware, MediaTechnik, and Borsy—resurfaced and, through new counsel, moved to set aside the judgment as void for lack of subject matter jurisdiction under Rule 60(b)(4).  They argued that Mediaware's principal place of business was Virginia when the Plaintiffs filed suit, meaning that Mediaware was a Virginia citizen for diversity purposes.  If true, that would have destroyed complete diversity, because three of the Plaintiffs were also Virginia citizens.

The district court denied the motion from the bench.  It noted that Borsy had, during the proceedings leading up to the default judgment, entered a declaration stating that Mediaware had no relevant contacts with Virginia.  That was inconsistent with his new, post-judgment argument that Mediaware was in fact headquartered there.  We affirmed, reasoning that the 2007 default judgment was not void unless there was "no arguable basis" for jurisdiction.  *Hawkins v. Borsey*, 319 F. App'x 195, 196 (4th Cir. 2008) (citing *Wendt v. Leonard*, 431 F.3d 410, 412–13 (4th Cir. 2005)).  This standard was not satisfied, particularly given Borsy's earlier declaration.

9

The Plaintiffs proved unable to enforce the 2007 default judgment, collecting just over $5,000 from a retainer held by Borsy's American attorney. Despite some contact with DIGI kft. and the other Respondents, the Plaintiffs never initiated enforcement proceedings in Hungary, ostensibly because the Hungarian courts would not afford them relief. However, the Plaintiffs later learned that one of i-TV's indirect parent companies had sought to access the U.S. capital markets in 2012 through a bond offering and, more recently, planned an initial public offering of stock in Romania. That apparently inspired them to try to collect from i-TV's owners in federal court.

Thus, in May 2017, the Plaintiffs returned to the Eastern District of Virginia. They moved to enforce the judgment against i-TV as well as several Respondents that were not parties to the original judgment. Four of the Respondents are companies, each representing a link in i-TV's chain of ownership: DIGI kft. (which owns i-TV, having acquired it from Borsy), RCS & RDS, S.A. (a Romanian company that wholly owns DIGI kft.), DIGI Communications N.V. (a Dutch company that controls RCS & RDS, S.A.), and RCS Management S.A. (a Romanian company that controls DIGI Communications N.V.). The Plaintiffs later added Zoltán Teszári (a Romanian citizen who owns a controlling stake in RCS Management S.A.) as a Respondent.[3] The

---

[3] The Plaintiffs also named Borsy in their motion to enforce. Borsy, however, appears to be in the wind; he never appeared in the proceedings on the motion.

Respondents were served overseas pursuant to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

Before the district court, the Plaintiffs presented two theories for imposing liability on the Respondents. The first is a successor-in-interest theory, according to which DIGI kft. succeeded to the Defendants' obligations under the default judgment when it acquired i-TV. The second is a civil-contempt theory, which posits that DIGI kft. aided and abetted Borsy's violation of the district court's injunctions. Borsy himself allegedly violated the injunctions when he sold i-TV to DIGI kft. in a two-step transaction. First, in October 2006, just after the district court entered its first injunction, Borsy convened a meeting of i-TV's shareholders and issued new shares to DIGI kft., giving it a 51% interest in i-TV. Second, in October 2008, Borsy sold his remaining shares to DIGI kft. through an entity incorporated in the Marshall Islands, violating the final injunction entered in 2007. The Plaintiffs claim that DIGI kft. was "in active concert or participation" with Borsy, Fed. R. Civ. P. 65(d)(2)(C), because it bought i-TV despite knowing that the injunctions forbade the sale.[4]

The Respondents opposed the Plaintiffs' motion to enforce. They argued, among other things, that the district court lacked personal jurisdiction over them as required to

---

[4] Less clear is exactly why the Plaintiffs believe that DIGI kft.'s direct and indirect owners should be held liable. The Plaintiffs' motion papers below insinuated that it was appropriate to pierce the corporate veil, arguing that "DIGI Kft. is part of a sham ownership conglomerate designed to improperly shield its owners from liabilities." J.A. 439. However, the Plaintiffs have never clearly articulated a veil-piercing theory, and now appear to argue instead that DIGI kft.'s owners knew of the injunction and directed DIGI kft. to help violate it. Response and Reply Brief of Appellants at 9.

grant the requested relief. The district court denied the motion to enforce without prejudice from the bench. It concluded that the motion raised "real issues that have to be fleshed out," requiring discovery. J.A. 754. The court barely addressed personal jurisdiction, noting that "when there's an allegation of contempt of court, which is floating around in here, that changes the jurisdiction issue." J.A. 757.

The matter then went into discovery. The Respondents objected to the scope of discovery, arguing that the Plaintiffs' requests went well beyond what could reasonably be had from foreign nonparties. The magistrate judge overseeing discovery disagreed, telling their counsel: "I consider your clients to be parties. I consider the obligations for your client to respond to discovery to be the same as if they were a party to this lawsuit." J.A. 873. The district court affirmed the magistrate judge's ruling over the Respondents' objections, without addressing the still-unresolved challenge to its personal jurisdiction over them. The Respondents later failed to meet certain discovery deadlines, explaining that legal, linguistic, and cultural differences made it difficult to obtain documents from the various Hungarian and Romanian entities in the case. The district court was unsympathetic and warned the Respondents that failing to meet their obligations would have consequences, explaining, "the ultimate is I own you. You do what I tell you to do." J.A. 1063.

In November 2017, the Respondents alerted the district court that they had discovered a potential jurisdictional defect in the underlying proceedings leading to the 2007 default judgment. The court's subject matter over those proceedings was grounded in diversity jurisdiction under 28 U.S.C. § 1332, which normally requires complete

12

diversity between the parties. When the complaint was filed in 2005, Hawkins held a one-third ownership interest in Peterfia, having purchased it from Borsy before the "roll-up" transaction was proposed. Peterfia is a type of Hungarian business entity known as a "korlátolt felelősségű társaság" or "kft." Such entities, the Respondents discovered, might be analogous to American limited liability companies. If so, then Defendant Peterfia had the citizenship of all of its members (including Plaintiff Hawkins) for diversity purposes, which would destroy complete diversity. By contrast, if Peterfia were treated as a corporation, then it would be a citizen of its place of incorporation and principal place of business, both of which were in Hungary. In that case, diversity jurisdiction would be proper. In November, the court stayed all discovery unrelated to this subject matter jurisdiction issue.

Based on this alleged defect, Respondents and i-TV then moved to vacate the 2007 default judgment as void for lack of diversity jurisdiction. The parties filed dueling reports by experts in Hungarian law that addressed whether Peterfia was more like an American limited liability company or a corporation. The Respondents and i-TV also filed a separate motion to vacate the 2007 default judgment as void for lack of due process. This motion argued that DIGI kft., which by 2007 had acquired a majority interest in i-TV, was an indispensable party to the 2007 judgment, which purported to adjudicate ownership rights to i-TV. Not only was DIGI kft. absent from the 2007 proceedings, the motion argued, but it could not have been joined because the district court lacked personal jurisdiction over it. Therefore, the district court could not lawfully render a judgment affecting DIGI kft.'s ownership rights in i-TV.

13

The district court granted the first motion, holding that Peterfia was analogous to a limited liability company and that the default judgment was therefore void for lack of diversity jurisdiction. While the court acknowledged a lack of binding Fourth Circuit precedent on "the appropriate test for determining whether a foreign business enterprise is a 'corporation'" for diversity purposes, the court concluded that Seventh Circuit case law resolved the issue. J.A. 2021. Under the Seventh Circuit's test, the district court reasoned, Peterfia should not be treated as a corporation because it lacks certain features (such as a board of directors and fully alienable shares) characteristic of American corporations. The district court also rejected the Plaintiff's request that it resolve any jurisdictional problem by dropping Peterfia from the case, declining in its discretion to do so. On that basis, the district court vacated the 2007 default judgment for lack of subject matter jurisdiction and entered a final judgment for the Defendants in that lawsuit. It declined to address the due process issue or the personal jurisdiction issue.

The Plaintiffs timely appeal the district court's decision to set aside the default judgment and enter judgment for the Defendants. We have appellate jurisdiction over the district court's final judgment. 28 U.S.C. § 1291. In addition, the Respondents and i-TV timely filed a cross-appeal challenging the district court's decision to permit discovery from the Respondents despite their objections to personal jurisdiction—a decision equivalent to a denial of a motion to dismiss—as well as the scope of that discovery. Because a final order has been entered, we have appellate jurisdiction to review the district court's interlocutory orders. *See Meadaa v. K.A.P. Enterprises, L.L.C.*, 756 F.3d 875, 879 (5th Cir. 2014); *Pacitti v. Macy's*, 193 F.3d 766, 776–77 (3d Cir. 1999).

14

II.

We start with the district court's order finding the 2007 default judgment void for lack of subject matter jurisdiction. While we usually review orders denying Rule 60(b) motions for abuse of discretion, whether a judgment is void under Rule 60(b)(4) presents an issue of law that we review de novo. *See Wendt v. Leonard*, 431 F.3d 410, 412 (4th Cir. 2005); *Compton v. Alton S.S. Co.*, 608 F.2d 96, 107 & n.21 (4th Cir. 1979). We conclude that the district court erred in finding the default judgment void because there was an arguable basis for subject matter jurisdiction.

A.

To begin with, the parties dispute what legal standard the district court should have applied to determine whether the 2007 default judgment was void for lack of subject matter jurisdiction. We conclude that i-TV must show that there was no arguable basis for subject matter jurisdiction. And while the Respondents argue that a different standard should apply to them, we need not resolve their request for Rule 60(b)(4) relief in light of our separate ruling on personal jurisdiction.

We begin with i-TV, the only Appellee who was a party to the underlying judgment. When a defendant named in a default judgment challenges it as void for lack of subject matter jurisdiction, the standard of review often turns on whether the defendant participated in the proceedings leading up to the judgment. Sometimes, the defendant never shows up at all. And that is his right: if the court lacks jurisdiction over the subject matter of the dispute, he need not appear. *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706 (1982). In that case, the defendant is usually free

15

to challenge the existence of subject matter jurisdiction in a later proceeding, and so the district court must review the jurisdictional question afresh as if it faced a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) during the underlying litigation. *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1181 (D.C. Cir. 2013).

A different standard applies, however, when the defendant appeared during the proceedings resulting in the default judgment but then declined to pursue a direct appeal. Even if the defendant did not litigate the specific issue of subject matter jurisdiction, he had a chance to do so, meaning that principles of *res judicata* apply. *See Insurance Corp. of Ireland*, 456 U.S. at 702 n.9.[5] In that posture, we treat the default judgment like any other final judgment. And out of respect for the finality of judgments, we will find the judgment void for lack of subject matter jurisdiction only in the narrowest circumstances. It is not enough for the court issuing the judgment to have erred in asserting jurisdiction over the case: the error must be "egregious," representing the "rare instance of a clear usurpation of power." *Wendt v. Leonard*, 431 F.3d 410, 413 (4th Cir. 2005). So long as there was an "arguable basis" for jurisdiction, we will uphold the judgment. *Id.* We make no distinction between factual and legal errors: we have upheld a final judgment

---

[5] Despite the Respondents' contention, a judgment on the merits has claim-preclusive effect that extends to issues of subject matter jurisdiction. *See, e.g.*, *Corbett v. MacDonald Moving Servs., Inc.*, 124 F.3d 82, 89 (2d Cir. 1997). The converse, though, is not true: a dismissal for lack of subject matter jurisdiction has only a narrow issue-preclusive effect, not a broad claim-preclusive effect on other issues. *See, e.g.*, *Perry v. Sheahan*, 222 F.3d 309, 318 (7th Cir. 2000).

where the propriety of jurisdiction turned on an issue of law that had split the courts of appeals, because the very existence of a circuit split suggested to us that the issue was arguable. *See id.* at 414.

Here, i-TV appeared through counsel in the 2007 proceedings, only to disappear—leading to the default judgment. When it appeared, i-TV had a chance to challenge the court's subject matter jurisdiction but did not. So i-TV must show there was no arguable basis for the district court's subject matter jurisdiction.

The Respondents assert that the "no arguable basis" standard should not apply to them because they, unlike i-TV, were not parties to the underlying action. In their view, they should be treated like a party to the judgment who never appeared. We find it unnecessary to address this argument because, as we explain below, the proceedings to enforce the judgment against the Respondents must be dismissed for lack of personal jurisdiction. That appears to afford them all the relief they seek in this appeal: they characterize dismissal for lack of personal jurisdiction as an "alternative ground for affirmance" of the district court's Rule 60(b)(4) order. Brief of Appellees/Cross-Appellants at 59 n.12.[6] Because the Respondents will otherwise receive the relief they

---

[6] That characterization may not be quite right. Relief from the judgment under Rule 60(b)(4) would mean it could not be enforced against the Respondents anywhere. The dismissal of the proceedings for lack of personal jurisdiction leaves open, at least in theory, the prospect of enforcement proceedings in a forum that has jurisdiction over the Respondents. But if other barriers stood in the way of such proceedings, then both forms of relief would effectively be the same, and that may be what the Respondents believe. Ultimately, the Respondents appear content with a dismissal based on personal jurisdiction, and so we will go no further.

want, we need not address whether they, as nonparties to the judgment, would have standing to bring a Rule 60(b)(4) motion and, if so, what standard they would have to meet.

B.

Applying the "no arguable basis" standard, we hold that the default judgment is not void for lack of subject matter jurisdiction.

In the initial litigation, the Plaintiffs asserted subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332(a). That provision gives the district courts original jurisdiction over actions between "citizens of different States," as well as actions between "citizens of a State and citizens or subjects of a foreign state," where the amount in controversy is over $75,000. The statute has long been interpreted to require complete diversity: no plaintiff may be a citizen of the same state as any defendant. *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806). Despite the apparent simplicity of diversity jurisdiction, in practice it can become complicated, ensnaring the parties (and judges, too) in jurisdictional disputes.

One longstanding difficulty in applying this rule lies in determining the citizenship of business organizations. *See generally Hertz Corp. v. Friend*, 559 U.S. 77, 84–88 (2010) (discussing evolving treatment of corporations). Different rules apply for corporations and unincorporated associations. A corporation has dual citizenship: it is a citizen of its state of incorporation and the state where its principal place of business is located. 28 U.S.C. § 1332(c)(1). The Supreme Court has been stingy in applying this dual-citizenship rule, holding that it applies only to true-blue "corporations." *Carden v.*

18

*Arkoma Assocs.*, 494 U.S. 185, 187–189 (1990). Any other business entity, such as a partnership, is treated as an unincorporated association, which has the citizenship of each of its members. *Id.* at 189. The citizenship-of-its-members rule sometimes turns subject matter jurisdiction into a tedious exercise in drafting organizational charts: members of an unincorporated association may themselves be unincorporated associations, requiring courts and litigants to trace citizenship through multiple layers of ownership.

Diversity jurisdiction here turns on how we characterize a Hungarian "korlátolt felelősségű társaság" or "kft." One of the Plaintiffs, Hawkins, owned one-third of Defendant Peterfia kft. when the complaint was filed. If Peterfia is a corporation, then it is a Hungarian citizen and diverse from all of the (American) Plaintiffs. But if Peterfia is an unincorporated association, then it shares Hawkins's citizenship, destroying complete diversity.[7]

Even for American entities, drawing a principled distinction between corporations and unincorporated associations is not always easy. The twentieth century saw the creation of new types of business entities that straddled the boundary separating

_____

[7] In their briefs, the Plaintiffs treat this as a question of fact, arguing that the Defendants' answers contained binding judicial admissions that Peterfia was a corporation. That is wrong. Whether a foreign business entity is a corporation for diversity purposes is a question of law that must be answered categorically for all business entities of that type, not a question of fact to be answered on an entity-by-entity basis. *See, e.g.*, *Carden*, 494 U.S. at 187–92 (considering whether a "limited partnership" organized under Arizona law was a corporation based on the general characteristics of such partnerships). We are not bound by the parties' prior positions in deciding that legal issue. *See Meyer v. Berkshire Life Ins. Co.*, 372 F.3d 261, 265 n.2 (4th Cir. 2004); *United States v. Teeter*, 257 F.3d 14, 28 (1st Cir. 2001).

traditional corporations from traditional partnerships: professional corporations, limited liability partnerships, limited liability companies, and so forth. Lower courts have tended to treat these newcomers as unincorporated associations given the Supreme Court's parsimonious approach to "corporation" status in *Carden*. For example, we and the other courts of appeals have uniformly treated limited liability companies—an innovation of the 1970s that offers some useful features of corporations (limited liability and separate legal personality) but remains sufficiently distinct to warrant tax treatment as partnerships—as unincorporated associations. *See Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 420 (3d Cir. 2010) (collecting cases). Still, the results sometimes seem arbitrary. Courts have generally found that all entities denominated as "corporations," even entities like professional corporations that differ in important ways from traditional corporations, should be considered corporations for diversity purposes. *Hoagland ex rel. Midwest Transit, Inc. v. Sandberg, Phoenix & von Gontard, P.C.*, 385 F.3d 737, 739–43 (7th Cir. 2004).

The situation does not get any easier when we turn to foreign business entities, particularly those from civil-law jurisdictions whose legal traditions differ from our own. At one point, the Supreme Court seemed to suggest a more generous approach for recognizing foreign business entities as "corporations." In *Puerto Rico v. Russell & Co.*, 288 U.S. 476 (1933), the Court considered the citizenship of a "*sociedad en comandita*," a Puerto Rican business entity that had some features of a corporation (in particular, separate legal personality) but some features of a partnership (some members did not have limited liability). *See id.* at 480–81. The Court reasoned that this entity was "a

juridical person" and therefore a citizen of Puerto Rico, even though none of its members was a Puerto Rican citizen. *Id.* at 481. This reasoning suggests that, for foreign business entities, legal personhood alone should be the feature distinguishing foreign corporations from foreign unincorporated associations. If adopted, that reasoning would sharply diverge from our approach to domestic business entities, for we have treated American limited liability companies as unincorporated associations even though they too have separate legal personhood. The Supreme Court has since suggested that *Russell*'s holding may be limited to its facts; certainly, it extends no further than foreign entities from civil-law jurisdictions. *Carden*, 494 U.S. at 190. Since calling *Russell* into doubt, however, the Court has not clarified how to determine whether a business entity organized under the laws of a civil-law jurisdiction is a corporation.

Without guidance from the Supreme Court, the Seventh Circuit has adopted an approach that involves examining the foreign entity's substantive features and comparing them to the characteristic features of an American corporation. *See, e.g.*, *BouMatic, LLC v. Idento Operations, BV*, 759 F.3d 790, 791 (7th Cir. 2014); *Lear Corp. v. Johnson Elec. Holdings Ltd.*, 353 F.3d 580, 582–83 (7th Cir. 2003). Those characteristic features include "perpetual existence, govern[ance] by a Board of Directors, ab[ility] to issue tradable shares . . . , and treat[ment] as independent of its equity investors—who are neither taxable on its profits nor liable for its debts." *Lear*, 353 F.3d at 583.

The Respondents and i-TV urge us to adopt the Seventh Circuit's approach, which they argue makes clear that Hungarian kfts. more closely resemble limited liability

21

companies than corporations.  We find, however, that there are at least two "arguable" bases" for treating Peterfia as a corporation.

First, our circuit has not yet adopted any approach to characterizing foreign civil-law business entities for diversity purposes.  We have not espoused the Seventh Circuit's approach.  Nor have we firmly rejected the Supreme Court's more generous approach in *Russell*,[8] under which Peterfia surely would count as a "corporation" because it has separate legal personhood.  Thus, it remains an open question in this Circuit whether to apply the Seventh Circuit's approach, the approach in *Russell*, or some other, entirely different approach.  To be sure, we might well be inclined to adopt the Seventh Circuit's approach if we were reviewing the issue de novo.  But the only issue before us is whether there is a colorable argument for a different approach under which Peterfia is a corporation.  In this Circuit, there is.

Second, even under the Seventh Circuit's approach, the issue can be remarkably slippery.  The Seventh Circuit itself has admitted that "[d]eciding whether a business enterprise based in a foreign nation should be treated as a corporation for the purpose of [diversity jurisdiction] can be difficult."  *Fellowes, Inc. v. Changzhou Xinrui Fellowes Office Equip. Co.*, 759 F.3d 787, 788 (7th Cir. 2014).  "Businesses in other nations may

---

[8] A panel of this court did suggest, in *R.H. Bouligny, Inc. v. United Steelworkers of America, AFL-CIO*, 336 F.2d 160 (4th Cir. 1964), *aff'd*, 382 U.S. 145 (1965), that *Russell* had no bearing on the scope of diversity jurisdiction at all, because it involved a jurisdictional statute specific to Puerto Rico.  *Id.* at 162–63.  Yet *Carden* threw cold water on that conclusion, explaining that *Russell* had "arguable relevance" to the issue of how to analyze the citizenship of business entities for diversity purposes.  494 U.S. at 190 n.2.

have attributes that match only a subset of those that in the United States distinguish a 'corporation.'" *Id.* This problem is made worse by the mismatch between the Seventh Circuit's labels-based approach to domestic business entities and its features-based approach to foreign business entities. The Seventh Circuit, like other courts, has accepted some entities that lack all the features of traditional corporations (such as professional corporations) as corporations for diversity purposes, while rejecting others (such as limited liability companies), based almost entirely on whether that type of business entity is called a "corporation." *See Hoagland*, 385 F.3d at 743. That makes it difficult to compare foreign entities to American entities based on their features alone.

The Seventh Circuit's decision in *BouMatic, LLC v. Idento Operations, BV*, 759 F.3d 790, shows how hard this analysis can be. There, the court considered a type of Dutch entity known as a "besloten vennootschap met beperkte aansprakelijkheid," or "BV." The court noted that a BV "has the standard elements of 'personhood' (perpetual existence, the right to contract and do business in its own name, and the right to sue and be sued) and issues shares to investors who enjoy limited liability." *Id.* at 791. The shares are alienable, subject to any restrictions imposed by the business. *Id.* These features, the Seventh Circuit concluded, caused a BV to resemble professional corporations and other closely held corporations that are treated as "corporations" for diversity purposes. *Id.*

The difficulty is that closely held corporations share most of these features with limited liability companies. The one exception is that a corporation issues "shares" while a limited liability company has "membership" interests. *See, e.g.*, *Fellowes*, 759 F.3d at

23

788. In many respects, however, this distinction is purely semantic. Is the difference that shares, but not membership interests, are freely alienable? Apparently not, because membership interests in limited liability companies are often more freely alienable than are shares in professional corporations. Shares in professional corporations usually can be issued only to licensed professionals, *see, e.g.*, 8 Del. C. § 610, and sometimes have other sales restrictions as well, *see* 8 Del. C. § 612 (by default, transfers of shares must be approved by majority of other shareholders). By contrast, as a default rule, economic interests in a limited liability company are fully alienable, although governance interests are not. *See, e.g.*, 6 Del. C. § 18-702; Uniform Limited Liability Company Act § 502 & cmt. (Nat'l Conf. of Comm'rs on Unif. State Laws 2013). Indeed, a few limited liability companies have been publicly listed. *See generally* Suren Gomtsian, *The Governance of Publicly Traded Limited Liability Companies*, 40 DEL. J. CORP. L. 207 (2015). Alternatively, does the distinction lie in the fact that shares are embodied in certificates, while membership interests are not? Here too, the distinction seems illusory. A stock certificate is hardly what makes a share a share: some corporations do not have certificates at all, and in any event, certificates are merely evidence of ownership of shares, not the shares themselves. *See* 11 FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS §§ 5089, 5091–5092. Moreover, at least some jurisdictions permit a limited liability company to issue membership certificates. *See* Uniform Limited Liability Company Act § 502(d); 6 Del. C. § 18-702(c).

The reasoning of *BouMatic* supports a colorable argument (but perhaps not a persuasive one) for an analogy between a kft. and a closely held corporation. The parties

24

do not appear to dispute that a kft. has legal personality and limited liability for investors. The main feature distinguishing a kft. from the foreign entity in *BouMatic* is that a kft. has "quotas" rather than "shares." Perhaps this is a difference in name only: the Plaintiffs' expert explained that, even if quotas in a kft. are subject to a right of first refusal by default, this default rule can be changed. *See* J.A. 1571–72 (Plaintiffs' expert report). Similar default restrictions sometimes apply to shares in professional corporations. *See* 8 Del. C. § 612. We also note that, while i-TV now asserts that this issue was not even arguable, during the initial proceedings, its prior counsel (which also represented Peterfia) described Peterfia as a "non-publicly traded corporation." J.A. 86.

In the end, the Respondents and i-TV may be right that a Hungarian kft. is an unincorporated association for diversity purposes. But this issue is arguable (and certainly was arguable in 2007, when the judgment was entered). Therefore, the district court erred in finding the judgment void for lack of subject matter jurisdiction. We need not address the Plaintiffs' alternative argument that the district court erred in declining to drop Peterfia as a defendant to save the judgment.

C.

The Respondents and i-TV argue for affirmance on the alternative ground that the judgment was void for lack of due process. We may decline to consider an alternative ground for affirmance that was not addressed by the district court, *see, e.g.*, *United States ex rel. Carson v. Manor Care, Inc.*, 851 F.3d 293, 307 (4th Cir. 2017), and we do so here. We leave this argument for the district court on remand.

We now turn to the cross-appeal, in which Respondents, all foreign persons, argue that they lacked adequate contacts with the forum to support personal jurisdiction over them. The district court's orders of June 30, 2017—which denied without prejudice the Plaintiffs' motion to enforce and compelled the Respondents to submit to expansive discovery—had the same effect as a denial of a motion to dismiss a complaint for lack of personal jurisdiction under Rule 12(b)(2). We therefore apply the standards governing Rule 12(b)(2) motions in reviewing the district court's orders.

When personal jurisdiction is addressed under Rule 12(b)(2) without an evidentiary hearing, the party asserting jurisdiction has the burden of establishing a *prima facie* case of jurisdiction. This "*prima facie* case" analysis resembles the plausibility inquiry governing motions to dismiss for failure to state a claim under Rule 12(b)(6). That is, the district court must determine whether the facts proffered by the party asserting jurisdiction—assuming they are true—make out a case of personal jurisdiction over the party challenging jurisdiction. *Sneha Media & Entm't, LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 196–97 (4th Cir. 2018). Unlike under Rule 12(b)(6), the court may also consider affidavits submitted by both parties, although it must resolve all factual disputes and draw all reasonable inferences in favor of the party asserting jurisdiction. *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 560 (4th Cir. 2014). The existence of a *prima facie* case of jurisdiction is a question of law we review de novo. *See Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).

Here, it is unclear whether the district court evaluated whether the Plaintiffs made out a *prima facie* case of personal jurisdiction. The court did not provide a written opinion explaining its decision to permit discovery in the face of the Respondents' personal-jurisdiction challenge. Ruling from the bench, the court made only a passing remark about personal jurisdiction, noting: "when there's an allegation of contempt of court, which is floating around in here, that changes the jurisdiction issue." J.A. 757.

Reviewing the issue de novo, we conclude that the Plaintiffs did not make out a *prima facie* case of personal jurisdiction over the Respondents. In their motion papers, the Plaintiffs advanced two alternative theories of personal jurisdiction: (1) that Respondents were successors-in-interest to the Defendants, and as such could be substituted in as parties under Rule 25(c); and (2) that Respondents aided and abetted Borsy in violating the district court's injunctions when they purchased i-TV, and that this represented a "super-contact" with the forum that alone permitted the exercise of personal jurisdiction over the Respondents. We reject the first theory for procedural reasons. We also conclude that the Plaintiffs' "super-contact" theory is insufficient as a matter of law.

A.

We start with the Plaintiffs' successor-in-interest theory. In principle, such a theory can establish personal jurisdiction: where one corporation has succeeded to another's liabilities, the predecessor corporation's forum contacts can be imputed to the successor corporation. *See City of Richmond v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 454–55 (4th Cir. 1990). But it does not work here.

27

This theory has been a moving target.  In the proceedings below, the Plaintiffs argued that the Respondents were successors-in-interest to the "Original Defendants," without clearly specifying which ones.  J.A. 444.  Yet the arguments they presented could only have applied to the defendant *companies*, such as i-TV.  The Plaintiffs sought to apply Virginia's test for successor liability arising from asset transfers, which requires that either:  "(1) the purchasing corporation expressly or impliedly agreed to assume [the predecessor corporation's] liabilities, (2) the circumstances surrounding the transaction warrant a finding that there was a consolidation or de facto merger of the two corporations, (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is fraudulent in fact."  J.A. 444–45 (emphasis omitted) (quoting *Kaiser Found. Health Plan of Mid-Atl. States v. Clary & Moore, P.C.*, 123 F.3d 201, 204 (4th Cir. 1997)).  This test applies when one company has bought the assets of another.  *See Kaiser*, 123 F.3d at 204; *Harris v. T.I., Inc.*, 413 S.E.2d 605, 608–609 (Va. 1992).  The Plaintiffs never presented the district court with any argument grounded in Virginia law to support a theory that the Respondents' predecessor-in-interest was a natural person, even though the Plaintiffs insist that Virginia law governs this issue.[9]

---

[9] We have our doubts about the Plaintiffs' claim that Virginia law governs successor-in-interest liability.  In diversity cases, district courts do not always apply the laws of the forum state; rather, they apply the forum state's conflict-of-laws rules to determine which law to apply.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  And there are good reasons to doubt whether, under conflict-of-laws principles, Virginia law should determine whether a Hungarian business entity that bought another Hungarian entity in Hungary is liable for the debts of the seller, who also happened to be a Hungarian national.  Nonetheless, since the Respondents have not raised the issue, we need not address it.

28

Thus, any such theory is waived for purposes of appeal. *See Pornomo v. United States*, 814 F.3d 681, 686 (4th Cir. 2016).

Now, on appeal, the Plaintiffs have disclaimed any theory that the Respondents succeeded to the liabilities of i-TV or one of the other company defendants, asserting instead that they are successors-in-interest to *Borsy*. Response and Reply Brief of Appellants at 53. The Plaintiffs thus limit themselves to the very theory they did not properly preserve for appeal: that the Respondents succeeded to the liabilities of a natural person. By changing horses midstream, the Plaintiffs have sunk their successor-in-interest theory. Thus, this cannot support their assertion of personal jurisdiction.

B.

The Plaintiffs' next theory is that the Respondents were "in active concert" with Borsy insofar as they aided and abetted his violation of the district court's injunction, Fed. R. Civ. P. 65(d)(2)(C), and that this fact suffices to establish personal jurisdiction. The Fifth Circuit's opinion in *Waffenschmidt v. MacKay*, 763 F.2d 711 (5th Cir. 1985), is the seminal authority advancing this theory. For the reasons we explain below, *Waffenschmidt*'s reasoning, to the extent it is viable at all, cannot be applied to foreign nonparties like the Respondents. To exercise jurisdiction over a foreign nonparty, a district court must find that the nonparty has minimum contacts with the forum, and as the facts of this case demonstrate, aiding-and-abetting a violation of an injunction issued by the forum court will not always suffice.

The *Waffenschmidt* court articulated two independent theories to support the exercise of jurisdiction over nonparty aiders-and-abettors. First, it held that federal

29

district courts have the inherent authority to enforce their injunctions nationwide, and that this authority necessarily includes the power to enforce injunctions against nonparties who aid and abet violators. 763 F.2d at 716–17. It also held, in the alternative, that the very act of aiding-and-abetting represents a sufficient contact with the forum state. *See id.* at 717, 721–23. Under this alternative theory, the act of aiding-and-abetting is sometimes called a "super-contact" because it alone supplies the "minimum contacts" required for a court to exercise personal jurisdiction. *See generally* Julia K. Schwartz, Comment, *"Super Contacts": Invoking Aiding-and-Abetting Jurisdiction to Hold Foreign Nonparties in Contempt of Court*, 80 U. CHI. L. REV. 1961 (2013).

We start our own analysis from fundamentals. To enter a judgment that adjudicates the rights of a party, a federal court must have personal jurisdiction over that party. Personal jurisdiction requires valid service of process that comports with due process. *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). That is, unless the party consents to jurisdiction, there must be (1) service that complies with the requirements of an applicable rule or statute, as well as (2) "minimum contacts" with the forum so that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice," *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). When the defendant is "at home" in the forum, then its contacts are so strong that it can be sued there on any cause of action without offending due process. *See Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014). This general or "all-purpose" jurisdiction is not at issue here, because the Respondents are not at home in the United States. Instead,

30

this case is about specific or "case-linked" jurisdiction, meaning there must be contacts related to this lawsuit. *See Walden v. Fiore*, 134 S. Ct. 1115, 1121 n.6 (2014).

Compliance with these basic personal-jurisdiction requirements is necessary to start contempt proceedings against a nonparty aider-and-abettor. When an aider-and-abettor was not a party to the underlying proceedings that led to the injunction, it must nonetheless be made a party to the contempt proceedings. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 112 (1969); *Lake Shore Asset Mgmt. Ltd. v. CFTC*, 511 F.3d 762, 767 (7th Cir. 2007). And that necessarily requires valid service of process comporting with the Constitution.[10] Armed with these principles, we address each of *Waffenschmidt*'s theories.

1.

According to *Waffenschmidt*'s first theory, district courts have inherent, nationwide authority to institute civil contempt proceedings against nonparties who aid and abet violations of injunctions and thus are "in active concert or participation" with a party under Rule 65(d)(2). Without deciding whether this theory is viable as applied to domestic aiders-and-abettors, we conclude that it does not extend to *foreign* ones. The reason is simple: it would violate due process for a district court to reach foreign aiders-and-abettors that lacked any contacts with the United States. *See ESAB Grp., Inc. v.*

---

[10] In this appeal, the Respondents have raised only the constitutional aspect of jurisdiction. They do not contest that they were served overseas in the manner prescribed by the Hague Convention. Nor have they questioned whether Rule 4.1(b) limits the service of orders to show cause that initiate a contempt proceeding.

*Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997) (explaining that due process "limits the extraterritorial scope of federal sovereign power"). Accordingly, no court of appeals has extended *Waffenschmidt*'s first theory to foreign nonparties, *see Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 137 (2d Cir. 2014), and we decline to do so here.[11] Alleged foreign nonparty contemnors must therefore have minimum contacts with the forum.[12]

Even for foreign nonparties, the overall viability of *Waffenschmidt*'s first theory may matter for the minimum-contacts analysis. If the theory is correct and courts may exercise jurisdiction over nonparty aiders-and-abettors nationwide, then we should arguably adopt a "national contacts" analysis, looking to foreign nonparties' contacts with the entire United States, not just the forum state. *Cf. ESAB Group*, 126 F.3d at 626–27 (holding, where Congress had authorized nationwide service of process, that jurisdiction over defendants served in the United States was proper despite inadequate contacts with forum state). Still, we need not decide the issue today: the Respondents' only alleged suit-related contacts with the United States were with Virginia. Thus, we

---

[11] The Seventh Circuit has suggested U.S. citizenship might be a sufficient hook for exercising personal jurisdiction over an aider-and-abettor, even if the relevant conduct occurred overseas. *See SEC v. Homa*, 514 F.3d 661, 675 (7th Cir. 2008). We express no view on that theory, which is not relevant here.

[12] We note that our sister circuits have split on whether *Waffenschmidt*'s first theory applies at all in diversity cases like this one. *Compare ClearOne Commc'ns, Inc. v. Bowers*, 651 F.3d 1200, 1214–16 (10th Cir. 2011) (applying *Waffenschmidt* in diversity case), *with Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d 34, 40 (2d Cir. 1989) (holding that personal jurisdiction over alleged nonparty contemnor in diversity action had to be supported by adequate contacts with forum state). Yet we need not weigh in on that split, because it is clear that this theory does not apply to foreign nonparties.

may turn to the "minimum contacts" analysis without resolving the viability of *Waffenschmidt*'s first theory as a general matter.

2.

To satisfy the "minimum contacts" test, the Plaintiffs rely on *Waffenschmidt*'s second, alternative theory: that the mere act of aiding and abetting a violation of an injunction under Rule 65(d)(2) is *necessarily* a sufficient contact to support personal jurisdiction. *See* 763 F.2d at 717, 721–23. We reject this theory because it sweeps too broadly: the mere act of aiding and abetting is not always enough to provide minimum contacts.

*Waffenschmidt* held that the in-forum "effects" of the nonparties' conduct established personal jurisdiction over them. In that case, a district court in Mississippi had enjoined the defendant from dissipating the proceeds of a stock sale. He did so anyway, transferring the funds from Mississippi to nonparty Texas residents. *Id.* at 714, 720–21. The Fifth Circuit found that the nonparty aider-and-abettors' conduct had two "effects" in Mississippi that constituted minimum contacts with the jurisdiction. First, the nonparty aiders-and-abettors "intended that their actions would have the effect of placing funds outside the reach of the Mississippi forum." *Id.* at 723. Second, "intentionally violating a court's orders has a substantial effect on the administration of justice in general, as well as the proper completion of the [plaintiffs'] litigation in particular." *Id.*

*Waffenschmidt*'s "effects" analysis cannot be generalized to every case of aiding and abetting. It is true that the in-forum effects of out-of-forum conduct can constitute

minimum contacts with the forum sufficient to support personal jurisdiction. *See Walden*, 134 S. Ct. at 1123–24 (citing *Calder v. Jones*, 465 U.S. 783 (1984)). There are, however, important limitations on this principle. These effects must create a connection to the *forum*, not just to parties who happen to live there. *See id.* at 1122–23. The connection must be "substantial." *Id.* at 1121. And a person cannot be haled into the forum simply because he knew that his conduct would have incidental effects there; he must have "expressly aimed" his conduct at the forum. *Id.* at 1124 n.7 (quoting *Calder*, 465 U.S. at 789); *see Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 280–81 (4th Cir. 2009); *Carefirst*, 334 F.3d at 398–99. Put differently, the forum must be the "focal point" of the conduct. *E.g.*, *Consulting Engineers*, 561 F.3d at 280.

For two independent reasons, aiding-and-abetting under Rule 65(d)(2)(C) does not always satisfy the "effects" test. First, as our facts demonstrate, there may not always be a substantial effect—purposeful or otherwise—in the forum. In *Waffenschmidt*, the nonparty respondents participated in transactions that took funds out of the forum (Mississippi) and put them somewhere else (Texas). Here, by contrast, the property at issue (shares in i-TV) appears to have been located—at all relevant times—in Hungary. When the Respondents acquired this property, it did not move beyond the reach of the district court; it merely moved from one inaccessible location overseas to another.[13] The

---

[13] Of course, the district court appears to have personal jurisdiction over Borsy both for procedural reasons (while he raised personal jurisdiction in his answer, he then disappeared and never filed a direct appeal of the default judgment against him) and substantive ones (some of Borsy's allegedly fraudulent dealings with the Plaintiffs (Continued)

lack of any real in-forum effect is shown by the Plaintiffs' inability to enforce their judgment against Borsy's Hungarian assets. Apart from a $5,000 retainer in the hands of Borsy's American lawyers, the Plaintiffs have gotten nothing out of Borsy over the last decade. Thus, transferring the shares from Borsy to DIGI kft. had no practical effect on the "proper completion of the [Plaintiffs'] litigation." *Waffenschmidt*, 763 F.3d at 723. Nor was there any other in-forum effect that, from a practical standpoint, can be characterized as substantial.

True, there is always an in-forum effect in the sense that any knowing violation of an injunction represents an affront to the dignity of the district court. But this effect is plainly not substantial enough to support personal jurisdiction. Every time a person knowingly violates a lawful command—whether imposed by an injunction, by a regulation, by a statute, or otherwise—that represents an affront to the body that issued the command. Just as a violation of a district-court injunction is an affront to the court, so a violation of a state statute is an affront to the state legislature. Yet a violation of the forum's law, standing alone, is not enough to establish personal jurisdiction—if that were true, then personal jurisdiction would always follow the merits, which of course is not correct.

Second, and independently, aiding-and-abetting under Rule 65(d)(2)(C) does not necessarily involve the sort of "express aiming" at the forum that the effects test requires.

occurred in Virginia). But that does not change the calculus for the Respondents, whose contacts with Borsy—which postdated the alleged fraud—occurred entirely abroad.

35

One person can help another violate an injunction for selfish reasons that make him merely indifferent to any effect in the forum. *Cf. Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 950 (9th Cir. 2014) (holding that "the party giving assistance need not affirmatively desire to cause a violation of the injunction; it is enough that the party know a violation is highly likely to occur"). Once again, the facts of this case are illustrative. The Plaintiffs have plausibly alleged, at most, that the Respondents bought i-TV from Borsy despite knowing that the sale would violate the injunction. Yet mere knowledge of an incidental in-forum effect falls short of express aiming. Nothing in the record suggests that the Respondents, in buying i-TV, aimed their conduct at Virginia or, more broadly, the United States as a whole.

For these reasons, the act of aiding-and-abetting does not necessarily constitute the "minimum contacts" that due process requires. This conclusion finds support in the serious comity concerns that would arise if we permitted the exercise of personal jurisdiction over foreign nonparties based on purely foreign conduct. The Supreme Court has cautioned, in other contexts, that the careless extension of personal jurisdiction over foreigners could antagonize other nations and make them less likely to respect our judgments. *See Daimler*, 134 S. Ct. at 762–63. The same concern applies here: other nations would surely look askance at us if a mere allegation of aiding-and-abetting, occurring entirely overseas, sufficed to provide our courts with jurisdiction over their citizens. Alternatively, foreign courts might reciprocate, asserting jurisdiction over U.S. citizens based on our conduct at home—an equally alarming prospect. Again, no court of appeals has extended the reasoning of *Waffenschmidt* to foreign conduct by foreign

36

nationals, *see Gucci America*, 768 F.3d at 137, and we decline the Plaintiffs' invitation to become the first.

In this case, the Plaintiffs have identified no suit-related forum contacts apart from their allegation of aiding-and-abetting.[14] They suggest that they should get jurisdictional discovery to identify other relevant contacts. Yet they have already obtained extensive discovery, and they do not suggest what other contacts they hope to uncover, meaning that further discovery would simply be a fishing expedition.

We therefore conclude that the district court lacks jurisdiction over the Respondents, who must be dismissed from these proceedings.

C.

The lack of personal jurisdiction over the Respondents may not necessarily end this litigation. The district court continues to have personal jurisdiction over i-TV, which was a party to the 2007 judgment. Yet it is unclear whether, as a practical matter, the Plaintiffs' attempt to enforce their judgment against i-TV in federal court is more than a fool's errand: i-TV appears to have no U.S. presence. And there are other issues, like laches, that potentially stand in the way of the Plaintiffs' attempt to enforce the 2007

---

[14] At oral argument, the Plaintiffs suggested that there might be another contact with the forum: Borsy allegedly put funds he acquired from the forum (that is, from the Plaintiffs themselves) into i-TV. While this may represent a meaningful contact between i-TV and the forum, there is no basis to attribute that contact to the Respondents who later purchased i-TV. As explained above, the Plaintiffs have disavowed any theory that the Respondents succeeded to i-TV's liabilities. The Plaintiffs also referenced the Respondents' efforts to access the U.S. capital markets, but these are not *suit-related* contacts that could support their assertion of specific jurisdiction.

injunction against i-TV.  Still, we leave those issues for the district court to determine in the first instance.

IV.

For the reasons given, we reverse the district court's grant of Rule 60(b)(4) relief and remand with an instruction that the Respondents be dismissed from the proceedings for lack of personal jurisdiction.

*REVERSED AND REMANDED*